## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

ERNESTINA CRUZ, as personal representative
of the Estate of GILBERT VALENCIA and G.R.V.,
a minor, through his next friend MARIANNA
WHEELER,

      Plaintiffs,

v.                                                                                    No. 2:22-cv-00957-MIS-GJF

CITY OF DEMING; DEMING POLICE
OFFICERS LEE COOK JORDAN; SERGIO
QUEZADA; CRISTOBAL PAZ; ADAM
ARAGON; ROBERT CHAVEZ; BENJAMIN
SANCHEZ; DAVID ACOSTA; and ASHLEY
STANDRIDGE; NEW MEXICO
DEPARTMENT OF PUBLIC SAFETY;
LUNA COUNTY; LUNA COUNTY SHERIFF'S
DEPARTMENT LIEUTENANT ARTURO
BAEZA; and JOHN DOES 1 through 9,

      Defendants.

### **ORDER DENYING DEFENDANTS' MOTION FOR RECONSIDERATION**

**THIS MATTER** is before the Court on "Defendants Luna County and Lieutenant Arturo

Baeza's Motion to Reconsider the Order [Doc. 52] on Defendants' Motion to Stay Discovery [Doc.

25]" ("Motion") [ECF No. 53], filed June 23, 2023 by Defendants Luna County and Lieutenant

Arturo Baeza (collectively "Defendants"). Plaintiffs Ernestina Cruz and G.R.V. (collectively

"Plaintiffs") filed their Response and Defendants filed their Reply. ECF Nos. 54, 55. Defendants

request the Court reconsider its interlocutory order, ECF No. 53. ECF No. 53 at 1–2. Therein, the

Court stayed discovery related to Defendant Baeza's alleged involvement in the events giving rise

to Count VI of Plaintiffs' Amended Complaint but permitted all other discovery to proceed. ECF

No. 53 at 4. Upon due consideration of the parties' submissions, the record, and the relevant law,

the Motion is **DENIED**.

## BACKGROUND

This case arises out of the shooting death of twenty-nine-year-old Gilbert Valencia during an encounter with the Deming Police Department and the New Mexico State Police. ECF No. 1-1 at 1. Specifically, Mr. Valencia was shot over 20 times by Defendants Deming Police Officers Robert Chavez, Cristobal Paz, Sergio Quezada, Benjamin Sanchez, and Adam Aragon. *Id.* at 3, ¶ 4; 16, ¶ 66–67.

Plaintiffs filed an Amended Complaint on December 15, 2022, in which they asserted three claims under 42 U.S.C. § 1983 ("Section 1983"), one claim under the Americans with Disabilities Act, 42 U.S.C. §§ 12101, *et seq.*, one claim under Section 504 of the Rehabilitation Act, 29 U.S.C. §§ 794 *et seq.*, and three claims under New Mexico state law. *Id.* at 19–38. There is no Section 1983 claim alleged against Defendant Luna County. With respect to Defendant Baeza, Plaintiffs bring one Section 1983 claim (Count VI) against him in his individual capacity for failure to intervene. *Id.* at 33–34.

On April 10, 2023, Defendants Luna County and Baeza filed a motion requesting that the Court stay all discovery as to all defendants in this case. ECF No. 27 at 1–2. They cited to Defendant Baeza's invocation of qualified immunity against Count VI of Plaintiff's Amended Complaint—the only Section 1983 claim against Defendant Baeza—in a motion for summary judgment to support their argument. *Id.* (citing ECF No. 25).

On June 20, 2023, the Court entered an order granting in part and denying in part Defendants Luna County and Baeza's request for a stay of discovery. ECF No. 52 at 1. Rather than stay the entire case, the Court implemented a tailored stay that corresponded precisely to Defendant Baeza's invocation of qualified immunity in response to Count VI of Plaintiffs' Amended Complaint. *Id.* at 5. As such, the Court stayed discovery related to Defendant Baeza's alleged

involvement in the events giving rise to Count VI of Plaintiffs' Amended Complaint but permitted all other discovery to proceed. *Id*. at 4.

Thereafter, on June 23, 2023, Defendants Luna County and Baeza filed the underlying Motion requesting reconsideration of the Court's interlocutory order granting in part and denying in part their request for a stay of discovery. ECF No. 53 at 1.

## PARTIES' ARGUMENTS

Defendants Luna County and Baeza contend the Court committed clear error in not ordering a stay of all discovery as to all defendants in this matter once Defendant Baeza invoked qualified immunity and that, therefore, the Court should reconsider its interlocutory order. *Id*. at 3. Specifically, they argue that "[c]ontrolling case law dictates that entry of a stay on discovery during the pendency of qualified immunity is effective as to all defendants." *Id*. at 2. In support, Defendants Luna County and Baeza cite to: (1) *Ashcroft v. Iqbal*, 556 U.S. 662 (2009); (2) *Harlow v. Fitzgerald*, 457 U.S. 800 (1982); (3) *Jiron v. City of Lakewood*, 392 F.3d 410 (10th Cir. 2004); (4) *Workman v. Jordan*, 958 F.2d 332 (10th Cir. 1992); and (5) *Wilkinson v. Maese*, No. 1:20-CV-783 MIS/KRS, 2021 U.S. Dist. 14869 (D.N.M. Jan. 26, 2021). *Id*. at 3–4. In sum, their position is that Defendant Baeza's "entitlement to qualified immunity must be resolved before *any* discovery can occur." *Id*. at 4 (emphasis added).

Plaintiffs assert that the lone Section 1983 claim against Defendant Baeza is based on his failure to intervene; hence, for there to be a failure to intervene, it logically follows that an underlying constitutional violation must exist. ECF No. 54 at 4. Thus, they argue, the Court properly exercised its discretion by concluding that it could not rule on Defendant Baeza's immunity defense without clarifying whether the underlying allegations of excessive force by the other officers were constitutional. *Id*. Additionally, Plaintiffs contend that Defendants Luna

County and Baeza have already participated in substantial discovery, making their concerns about disruption disingenuous. *Id*. at 5. To conclude, Plaintiffs state that the purpose of a discovery stay should not be to frustrate a plaintiff's efforts to determine whether a law enforcement's conduct is objectively reasonable. *Id*.

## LEGAL STANDARD

The Federal Rules of Civil Procedure do not expressly prescribe how a district court should reconsider an interlocutory order pertaining to discovery. *Cf.* Fed. R. Civ. P. 54(b) ("[A]ny order . . . that adjudicates fewer than all the claim or the rights and liabilities of fewer than all the parties . . . may be revised at any time before the entry of a judgment . . . .").

For reference, an interlocutory order is "[a]n order that relates to some intermediate matter in the case; any order other than a final order." *Order*, Black's Law Dictionary (11th ed. 2019). A final order or judgment, on the other hand, is "[a] court's last action that settles the rights of the parties and disposes of all issues in controversy, except for the award of costs (and, sometimes, attorney's fees) and enforcement of the judgment." *Judgment*, Black's Law Dictionary (11th ed. 2019). An interlocutory order is distinct from a final judgment in that an interlocutory order—with some exceptions—is not appealable until the case is fully resolved. *See* Fed. R. Civ. P. 54(a) (defining "judgment" as "a decree and any order from which an appeal lies").

Notwithstanding the above, a district court has broad inherent discretion to reconsider an interlocutory order. *Elephant Butte Irrigation Dist. v. U.S. Dep't of Interior*, 538 F.3d 1299, 1306 (10th Cir. 2008) ("[E]very order short of a final decree is subject to reopening at the discretion of the district judge."). Although Rules 59(e) and 60 pertain to relief from judgments and not interlocutory orders, district courts are typically guided by the standards that govern those rules in deciding whether to alter or vacate an interlocutory order. *See, e.g.*, *Ellis v. Hobbs Police Dep't*,

No. 217CV01011KWRGBW, 2021 WL 184460, at *1–2 (D.N.M. Jan. 19, 2021); *Mantooth v. Bavaria Inn Rest., Inc.*, 360 F. Supp. 3d 1164, 1168–69 (D. Colo. 2019); *Anderson Living Tr. v. WPX Energy Prod., LLC*, 308 F.R.D. 410, 427–33 (D.N.M. 2015); Sump v. Fingerhut, Inc., 208 F.R.D. 324, 326–27 (D. Kan. 2002).

A motion for reconsideration is not an appropriate vehicle "to reargue an issue previously addressed by the court when the motion merely advances new arguments, or supporting facts which were available at the time of the original motion." *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000). Rather, the party moving for reconsideration typically must show "(1) an intervening change in the controlling law, (2) new evidence previously unavailable, [or] (3) the need to correct clear error or prevent manifest injustice." *Id*. "Thus, a motion for reconsideration is appropriate where the court has misapprehended the facts, a party's position, or the controlling law." *Id*.

## DISCUSSION

The Court holds that—contrary to Defendants Luna County and Baeza's contentions—binding precedent does not mandate that a district court stay *all discovery* as to *all defendants* merely because at least one defendant invokes qualified immunity in a dispositive motion. Rather, the issuance of a discovery stay remains within the sound discretion of the district court, as outlined below, and the Court did not commit clear error in exercising its discretion in issuing a tailored discovery stay in this case.

## I. The History of Qualified Immunity and Accompanying Prophylactic Discovery Stays

In 1871, in response to an ongoing pattern of violence and intimidation against newly emancipated African Americans, Congress enacted the Ku Klux Klan Act, now codified as 42

5

U.S.C. 1983 ("Section 1983"). Section 1983 created a federal cause of action to address constitutional violations committed by state actors under color of law. Nevertheless, Section 1983 spawned relatively few cases for decades, primarily because its language closely tracked that of the Privileges and Immunities Clause in the Fourteenth Amendment of the United States Constitution, which the Supreme Court rendered a near constitutional dead letter in the *Slaughter-House Cases*, 83 U.S. 36, 37–38 (1872). In fact, only 19 cases were brought under Section 1983 in the first 65 years of its existence. Note, *Limiting the Section 1983 Action in the Wake of Monroe v. Pape*, 82 Harv. L. Rev. 1486, 1486 n.4 (1969).

In 1961, the Supreme Court revitalized Section 1983 when it decided *Monroe v. Pape*, 365 U.S. 167 (1961). First, the Supreme Court held that actions taken by state governmental officials in carrying out their official responsibilities, even if contrary to state law, were nevertheless actions taken "under color of law." *Id*. at 186. And second, it held that injured individuals have a federal remedy under Section 1983 even if the officials' actions also violated state law. *Id*. at 183–87. *Monroe* effectively expanded the viability of Section 1983 claims, thereby easing the standard for plaintiffs to assert such claims.

Six years after *Monroe* was decided, the Supreme Court first recognized a "defense of good faith and probable cause" for officers sued for false arrest under Section 1983. *Pierson v. Ray*, 386 U.S. 547, 557 (1967). The *Pierson* Court reasoned that Section 1983 "should be read against the background of tort liability" as understood at the common law. *Id*. at 556–57. Although Section 1983 "on its face does not provide for *any* immunities," *Malley v. Briggs*, 475 U.S. 335, 342 (1986), this "good-faith and probable-cause defense evolved into our modern qualified-immunity doctrine." *Wyatt v. Cole*, 504 U.S. 158, 170 (1992) (Kennedy, J., concurring).

Qualified immunity jurisprudence was notably shaped by two pivotal cases from the 1980s: *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), and *Mitchell v. Forsyth*, 472 U.S. 511 (1985). In *Harlow*, the plaintiff alleged that personal aides to President Richard Nixon conspired to fire him from his Air Force position in retaliation for his congressional testimony about the mismanagement of plane purchases. 457 U.S. at 802. The Supreme Court was specifically concerned with "the scope of the immunity available to the senior aides and advisers of the President of the United States in a suit for damages based upon their official acts." *Id*. In deciding this question, *Harlow* announced a new standard for qualified immunity: "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id*. at 818.

This new test eliminated the subjective component of the qualified immunity inquiry set forth in *Wood v. Strickland*, 420 U.S. 308 (1975). Before *Harlow*, the subjective component required determining whether a government official's actions were taken with "malicious intent" or "bad faith" to cause a deprivation of an individual's constitutional rights. *Wood*, 420 U.S. at 322. *Harlow* decried that focus on an official's subjective state of mind frequently proved incompatible with the principle that *insubstantial* claims should not proceed to trial. 457 U.S. at 815–16. Indeed, the prior regime often required "[j]udicial inquiry into subjective motivation," which could include "broad-ranging discovery and the deposing of numerous persons . . . ." *Id*. at 817. Thus, to strike "a balance between the evils inevitable in any available alternative," the new standard's reliance on objective reasonableness was crafted to "avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." *Id*. at

813, 818. The Supreme Court, thus, provided insight into the new procedure it envisioned would occur:

> On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred. If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to "know" that the law forbade conduct not previously identified as unlawful. Until this threshold immunity question is resolved, discovery should not be allowed. If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct. Nevertheless, if the official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained. But again, the defense would turn primarily on objective factors.

*Id*. at 818–19 (footnote omitted).

With the establishment of a new standard for qualified immunity, the Supreme Court first acknowledged and sanctioned an accompanying prophylactic stay of discovery. *See id*. ("Until this threshold immunity question is resolved, discovery should not be allowed."). However, this often-quoted dicta[1] should be read in the context in which it was written. The underlying suit in *Harlow* involved former President Richard Nixon and two high-ranking government officials sued in their individual capacities for damages pursuant to *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971),[2] all of whom sought immunity. *Nixon v. Fitzgerald*, 457 U.S. 731, 748 (1982).

---

[1] "Dicta are 'statements and comments in an opinion concerning some rule of law or legal proposition not necessarily involved nor essential to determination of the case in hand.'" *Rohrbaugh v. Celotex Corp*., 53 F.3d 1181, 1184 (10th Cir. 1995) (quoting Black's Law Dictionary 454 (6th ed. 1990)). Dicta are not binding and do not establish legal precedent. *Humphrey's Executor v. United States*, 295 U.S. 602, 627 (1935) (dicta "may be followed if sufficiently persuasive" but are not binding).

[2] A "*Bivens* action is the federal analog to suits brought against state officials under Rev. Stat. § 1979, 42 U.S.C. § 1983." *Hartman v. Moore*, 547 U.S. 250, 254 n.2 (2006).

The case did not involve any defendants for which absolute or qualified immunity would be inapplicable, meaning that a stay as to only some defendants would not have been relevant. Moreover, the surrounding language in the paragraph pertains to a hypothetical scenario in which an individual defendant is seeking summary judgment based on qualified immunity. Considering these circumstances, the case cannot be considered to mandate a global stay in every case where qualified immunity is at issue. Indeed, it would be equally reasonable to construe the Supreme Court as stating that discovery should not be permitted as to the *individual defendant invoking qualified immunity in a motion for summary judgment* until said motion is resolved.

In *Mitchell*, the Supreme Court held that denial of a defendant's motion for dismissal or summary judgment on the ground of qualified immunity was an immediately appealable interlocutory decision. 472 U.S. at 525, 527. It reasoned that qualified immunity "is an *immunity from suit* rather than a mere defense to liability," and "is effectively lost if a case is erroneously permitted to go to trial." *Id*. at 526. The Supreme Court further opined that:

> Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery. Even if the plaintiff's complaint adequately alleges the commission of acts that violated clearly established law, the defendant is entitled to summary judgment *if discovery* fails to uncover evidence sufficient to create a genuine issue as to whether the defendant in fact committed those acts. *Harlow* thus recognized an entitlement not to stand trial or face the other burdens of litigation, *conditioned on the resolution of the essentially legal question whether the conduct of which the plaintiff complains violated clearly established law*.

*Id*. (citations omitted) (emphasis added).

Yet here, albeit in dicta, the Supreme Court suggests that some discovery may be available at the summary judgment stage and that the entitlement to be free from the "other burdens of litigation" is conditioned on the *resolution* of the question of qualified immunity. In other words,

if the question of qualified immunity is resolved in favor of the official, *then* they receive the accompanying benefits, including protection from further discovery-related obligations.

The Supreme Court specifically addressed some of the confusion created by *Harlow* in *Crawford-El v. Britton*, 523 U.S. 574 (1998). In *Crawford-El*, a "litigious and outspoken" inmate filed a First Amendment retaliation claim, which necessitates proof of retaliatory motive, arising from the alleged retaliation he experienced for previously filed lawsuits. *Id.* at 578–79. The D.C. Circuit Court of Appeals, sitting en banc, reviewed the dismissal of the inmate's First Amendment retaliation claim. *Id.* at 581. The en banc court ordered the parties to file briefs addressing, in part, whether there were "any alternative devices which protect defendants with qualified immunity, in cases of constitutional tort depending on the defendant's motive or intent, from the costs of litigation?" *Id.* at 582.

A majority of the D.C. Circuit Court of Appeals agreed that "special procedures to protect defendants from the costs of litigation in unconstitutional-motive cases are required by the reasoning in this Court's opinion in *Harlow*." *Id.* at 582–83. Thus, the Court of Appeals held that (1) "*Harlow* allows an official to get summary judgment resolution of the qualified immunity issue, including the question of the official's state of mind, *before* the plaintiff has engaged in discovery on that issue," and (2) "that unless the plaintiff offers clear and convincing evidence on the state-of-mind issue at summary judgment and trial, judgment or directed verdict (as appropriate) should be granted for the individual defendant." *Id.* at 583.

On appeal to the Supreme Court was the issue of "whether the courts of appeals may craft special procedural rules for [constitutional claims that requires proof of improper motive] to protect public servants from the burdens of trial and discovery that may impair the performance of their official duties." *Id.* at 577. The Supreme Court recognized that "[b]ecause an official's state

10

of mind is 'easy to allege and hard to disprove,' insubstantial claims that turn on improper intent may be less amenable to summary disposition than other types of claims against government officials." *Id*. at 584–85. Thus, "[t]his category of claims therefore implicates obvious concerns with the social costs of subjecting public officials to discovery and trial, as well as liability for damages." *Id*. at 585.

However, the Supreme Court rejected the D.C. Circuit Court of Appeals' overly expansive interpretation of *Harlow* and held the qualified immunity standard set forth in *Harlow* did not change or create a heightened burden of proof for unconstitutional-motive cases. *Id*. at 589. Indeed, the Supreme Court emphasized that "various procedural mechanisms already enable trial judges to weed out baseless claims that feature a subjective element." *Id*. at 593. It clarified that:

> These various protections may not entirely foreclose discovery on the issue of motive, and the Court of Appeals adopted its heightened proof standard in large part to facilitate the resolution of summary judgment motions before any discovery at all. Discovery involving public officials is indeed one of the evils that *Harlow* aimed to address, but neither that opinion nor subsequent decisions create an immunity from *all* discovery. *Harlow* sought to protect officials from the costs of "broad-reaching" discovery, and we have since recognized that limited discovery may sometimes be necessary before the district court can resolve a motion for summary judgment based on qualified immunity.

*Id*. at 593 n.14 (citation omitted).

The Supreme Court was sympathetic to the D.C. Circuit Court of Appeals' efforts to "reduce the availability of discovery in actions that require proof of motive." *Id*. at 595. However, the Supreme Court made clear that "questions regarding pleading, discovery, and summary judgment are most frequently and most effectively resolved either by the rulemaking process or the legislative process," not "judicial rulemaking." *Id*. at 595–96. It warned that "the Court of Appeals' indirect effort to regulate discovery employs a blunt instrument that carries a high cost,

11

for its rule also imposes a heightened standard of proof at trial upon plaintiffs with bona fide constitutional claims." *Id*. at 595–96.

Rather, the Supreme Court outlined the procedures available to the district court to address the issue of broad-reaching discovery. *Id*. at 597. When a complaint against an official in their individual capacity is initially filed, the district court "must exercise its discretion in a way that protects the substance of the qualified immunity defense . . . so that officials are not subjected to unnecessary and burdensome discovery or trial proceedings." *Id*. at 597–98. The district court may first "determine whether, assuming the truth of the plaintiff's allegations, the official's conduct violated clearly established law." *Id*. at 598. At this stage, "the district court should resolve that threshold question before permitting discovery." *Id*. If the plaintiff's Section 1983 claim survives the motion to dismiss phase, "the plaintiff ordinarily will be entitled to some discovery." *Id*. Importantly, the Supreme Court recognized that the Federal Rules of Civil Procedure vests "the trial judge with broad discretion to tailor discovery narrowly and to dictate the sequence of discovery." *Id*. at 598–99 (citing Fed. R. Civ. P. 26). It concluded that the district court could adequately manage discovery and should give priority to issues bearing on the qualified immunity defense. *Id*. at 599–600.

In sum, *Crawford-El* affirmed that the discretion district courts possess to manage discovery remained unchanged and clarified that the reasoning underlying *Harlow* did not grant or justify automatic immunity from all discovery. *Id*. at 601 (noting that "broad discretion in the management of the factfinding process may be more useful and equitable to all the parties").

Last in the progeny is *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Iqbal—a Pakistani Muslim— was arrested and detained by federal officials shortly after the September 11, 2001 terrorist attacks as part of a counterterrorism investigation. *Id*. at 666–67. He alleged that he was subjected to harsh

and discriminatory treatment while in detention in violation of the First and Fifth Amendments to the United States Constitution. *Id*. at 668–69. Further, he claimed that high-ranking officials, including former Attorney General John Ashcroft and FBI Director Robert Mueller, were responsible for the discriminatory detention and abusive treatment based on his religion, race, and national origin. *Id*. at 669. The complaint named Ashcroft as the "principal architect" of the policy of "holding post–September–11th detainees in highly restrictive conditions of confinement" and Mueller as "instrumental in [its] adoption, promulgation, and implementation." *Id*.

Ashcroft and Mueller moved to dismiss the complaint for failure to state sufficient allegations to show their own involvement in clearly established unconstitutional conduct; however, the district court denied their motion. *Id*. On appeal to the Supreme Court was the following "narrow question: Did respondent, as the plaintiff in the District Court, plead factual matter that, if taken as true, states a claim that petitioners deprived him of his clearly established constitutional rights[?]" *Id*. at 666. In sum, the Supreme Court held that the interpretation of Rule 8 as pronounced in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007), applied to all civil actions and that, therefore, Iqbal's complaint failed to plead sufficient facts to state a claim for purposeful and unlawful discrimination. *Id*. at 684, 687.

In dicta, the Supreme Court considered Iqbal's argument that construction of Rule 8 should be tempered where the Court of Appeals has "instructed the district court to cabin discovery in such a way as to preserve" a defendant's defense of qualified immunity "as much as possible in anticipation of a summary judgment motion." *Id*. at 684. The Supreme Court—in nonbinding discussion—rejected an approach where "a claim just shy of a plausible entitlement to relief can, if groundless, be weeded out early in the discovery process through careful case management,"

particularly where an official is entitled to assert the defense of qualified immunity. *Id*. at 685. It further elaborated that:

> It is no answer to [the various] concerns to say that discovery for petitioners can be deferred while pretrial proceedings continue for other defendants. It is quite likely that, when discovery as to the other parties proceeds, it would prove necessary for petitioners and their counsel to participate in the process to ensure the case does not develop in a misleading or slanted way that causes prejudice to their position. Even if petitioners are not yet themselves subject to discovery orders, then, they would not be free from the burdens of discovery.

*Id*. at 685–86.

Thus, the Supreme Court outlined its reservations about allowing insubstantial claims to advance to the discovery stage. However—in spite of the Supreme Court's strongly expressed concerns—*Iqbal* did not eliminate the authority held by district courts to manage the discovery process. Nor did the *Iqbal* Court decide whether all discovery as to all defendants should be stayed when one defendant invokes qualified immunity in a dispositive motion. Indeed, as discussed below, the weight of the authority does not support Defendants Luna County and Baeza's position. For the reasons that follow, and given the circumstances of this individual case, the Court does not share the concerns of the *Iqbal* Court regarding a partial stay of discovery and will not reconsider its earlier order.

## II.     Judicial Discretion in Implementing Discovery Stays Extends to Section 1983 Suits

As a general matter, a district court "has broad discretion to stay proceedings as an incident to its power to control its own docket," including the decision to issue a protective order and temporarily suspend discovery. *Clinton v. Jones*, 520 U.S. 681, 706 (1997); Fed. R. Civ. P. 26(c). This is further reinforced by the fact that federal appellate courts rarely review discovery orders as

they "are unlikely to be reversed on appeal . . . ." *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 110 (2009).

It is uncontroversial that when an official sued in their individual capacity for damages pursuant to Section 1983 files a dispositive motion invoking qualified immunity, a prophylactic stay of discovery relating to that officer's alleged involvement in the Section 1983 claim typically follows. However, one official's mere assertion of qualified immunity *does not* obligate the district court to impose a global stay of the entire case, including as to defendants and claims where qualified immunity is inapplicable. Defendants Luna County and Baeza's position that such a stay is mandated by binding precedent rather than within the sound discretion of the district court is simply unsupported by the case law.

None of the cases upon which Defendants Luna County and Baeza rely—including *Harlow* and *Iqbal*—"stand for the proposition that *all discovery* as to *all defendants* must be stayed pending a court's resolution of an assertion of qualified immunity." *Saenz v. City of El Paso, Tex.*, No. EP-14-CV-244-PRM, 2015 WL 4590309, at *2 (W.D. Tex. Jan. 26, 2015). In fact, a multitude of district court decisions, as well as legal scholarship, have concluded that *Iqbal* and *Harlow* never purported to alter long-standing precedent that provides district courts considerable discretion in controlling the scope, timing, and methodology of discovery so as to mandate a global stay of discovery. *See, e.g.*, *McGinn v. El Paso Cnty., Colorado*, No. 22-CV-01387-WJM-MDB, 2022 WL 16924058, at *2–3 (D. Colo. Nov. 14, 2022); *Est. of Melvin by & through Melvin v. City of Colorado Springs, Colorado*, No. 20-CV-00991-CMA-MDB, 2022 WL 3975003, at *2 (D. Colo. Sept. 1, 2022); *Drewniak v. U.S. Customs & Border Prot.*, 563 F. Supp. 3d 1, 5–6 (D.N.H. 2021); *Hoedel v. Kirk, No. 19-2443-HLT*, 2020 WL 3892965, at *2–3 (D. Kan. July 10, 2020); *Weaver v. Stroman*, No. 1:16-CV-01195-ADA, 2020 WL 3545655, at *2–3 (W.D. Tex. June 30, 2020); *Davis*

*v. Matagorda Cnty.*, No. 3:18-CV-00188, 2019 WL 1924532, at \*2–4 (S.D. Tex. Apr. 30, 2019);

*Sweet v. City of Mesa*, No. CV-17-00152-PHX-GMS, 2018 WL 3633745, at \*1–2 (D. Ariz. July

31, 2018); *Feibush v. Johnson*, 280 F. Supp. 3d 663, 665–66 (E.D. Pa. 2017); *Saenz*, 2015 WL

4590309, at \*2–5; *Mendia v. Garcia*, No. 10-CV-03910-MEJ, 2016 WL 3249485, at \*2–5 (N.D.

Cal. June 14, 2016); *Martin v. Naval Crim. Investigative Serv.*, No. 10CV1879 WQH MDD, 2013

WL 2896879, at \*11 (S.D. Cal. June 11, 2013); *M.G. v. Metro. Interpreters & Translators, Inc.*,

2013 WL 690833, at \*2 (S.D. Cal. Feb. 26, 2013); *Roth v. President & Bd. of Trustees of Ohio

Univ.*, No. 2:08-CV-1173, 2009 WL 2579388, at \*1–3 (S.D. Ohio Aug. 18, 2009). *See also*

Matthew L. Garcia & George Bach, *Iqbal Is Not A Game Changer for Discovery in Civil Rights

Cases*, 42 N.M. L. Rev. 329, 329–42 (2012); John C. Williams, *Qualifying Qualified Immunity*,

65 Vand. L. Rev. 1295, 1336 n. 49 (2012); Kevin J. Lynch, *When Staying Discovery Stays Justice:

Analyzing Motions to Stay Discovery When A Motion to Dismiss Is Pending*, 47 Wake Forest L.

Rev. 71, 83 (2012); Chad Howell, *Qualified Discovery: How Ashcroft v. Iqbal Endangers

Discovery When Civil Rights Plaintiffs File Suit Against Government Officials*, 21 Geo. Mason U.

Civ. Rts. L.J. 299, 300 (2011). Our sister district exemplifies this consensus, where "[e]ven in

cases where defendants raise a qualified immunity defense, courts within the District of Colorado

generally disfavor a stay of all discovery." *Est. of Melvin by & through Melvin*, No. 20-CV-00991-

CMA-MDB, 2022 WL 3975003, at \*1.

Accordingly, the Court is unpersuaded to follow any purported custom by the District of

New Mexico to automatically issue a global stay of discovery. *See Higgins v. Saavedra*, No. 1:17-

CV-00234-WPL-LF, 2017 WL 1437317, at \*1 (D.N.M. Apr. 21, 2017) ("Standard practice in [the

District of New Mexico] is to stay discovery—as to all defendants—when the defense of qualified

immunity has been raised."). This is partly because qualified immunity, as a defense, is limited to

particular claims against particular individuals. As such, "the corresponding protection against burdensome discovery is also limited." *Rome v. Romero*, 225 F.R.D. 640, 643 (D. Colo. 2004).

First, the "defense is available only to individual government officials, not governmental entities."[3] *Id*. (citing *Owen v. City of Independence*, 445 U.S. 622 (1980)). Further, "it is applicable only against claims for monetary damages, and has no application to claims for declaratory or injunctive relief." *Id*. (citing *Meiners v. University of Kansas*, 359 F.3d 1222, 1233 n. 3 (10th Cir. 2004)). "Finally, the doctrine is applicable only to claims against officers in their individual capacities; official-capacity claims, being the equivalent of a claim against an entity, are not subject to qualified immunity." *Id*. (citing *Meiners*, 359 F.3d at 1233 n. 3). In sum, qualified immunity is only available to local, state, or federal officials sued in their individual capacities for monetary damages under Section 1983. That is, it is government officials themselves who benefit, meaning that the equities of staying discovery in any given case depend on who is in the case and what claims have been brought.

Additionally, in order to seek a stay based on the qualified immunity defense, the defendant must first raise the issue in a dispositive motion. *Id*. at 644. The government official who does not raise qualified immunity in a motion to dismiss "cannot be said to be unduly burdened if he foregoes an opportunity to address the issue prior to the commencement of discovery, and instead waits to assert it until some point later in the litigation." *Id*. As such, whether a stay is contemplated depends not only on who and what claims are in the case but whether an official moves to invoke the defense of qualified immunity.

---

[3] A claim against a government entity is commonly referred to as a *Monell* claim after *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).

It is important to also note that a government official could become subject to the discovery process where a plaintiff brings a complaint containing a Section 1983 claim that lacks a qualified immunity defense. For instance, a plaintiff may file a complaint with a lone Section 1983 count seeking *injunctive* relief from a government official in their *official* capacity. This official would, of course, be unable to seek qualified immunity and, thus, a corresponding prophylactic stay of discovery. While the same rationale that underpins *Harlow* and *Iqbal* in shielding officials from discovery holds true in this instance, the Supreme Court has never held that a Section 1983 claim devoid of a qualified immunity defense likewise warrants a preemptive stay of discovery. Accordingly, the Supreme Court has not mandated every government official be exempted from every litigation-related inconvenience—even those in a potentially frivolous case.

Further, a government official's participation in discovery may be inevitable in cases where a plaintiff files a complaint alleging a mix of different Section 1983 claims, only some of which are subject to a qualified immunity defense. For example, a complaint may allege both a claim against a county and a county official in their individual capacity. Arguably, the county official's testimony may be required irrespective of whether they are granted qualified immunity. *See, e.g., Davis*, No. 3:18-CV-00188, 2019 WL 1924532, at *3. If the district court determines the county official is not entitled to qualified immunity, they will remain a defendant, with the plaintiff fully entitled to take their depositions as part of the discovery process. But even if the district court finds that the county official is entitled to qualified immunity, the official may nonetheless remain a material witness with respect to the claim against the county itself—government officials are therefore not necessarily exempted from the burdens of litigation even when they *are* awarded qualified immunity, but instead only from the burdens of litigation with regards to the relevant claim itself.

Similarly, qualified immunity is inapplicable as a defense to other federal statutes or state law claims. Accordingly, an official named in a complaint that alleges claims under Section 1983 along with violations of other federal statutes or state law could still potentially be subject to discovery on the other claims even if granted qualified immunity on the Section 1983 claim. *See, e.g.*, *McGinn*, No. 22-CV-01387-WJM-MDB, 2022 WL 16924058, at *3.

In conclusion, the Court retains its discretion in implementing discovery stays in Section 1983 cases, and the implementation of such stays is and should remain subject to equity concerns related to the specific circumstances at hand in any given case.

### III.     Balancing the Competing Interests in Issuing a Global Stay of Discovery

Where one defendant asserts qualified immunity, the district court should evaluate the nature of the case, the potential prejudice to the stayed defendant, and the impact on other parties before deciding to proceed with discovery concerning the non-invoking defendants or on additional claims for which qualified immunity is inapplicable.

Issuing a global stay of discovery has several advantages. As a general proposition, "[l]itigation, though necessary to ensure that officials comply with the law, exacts heavy costs in terms of efficiency and expenditure of valuable time and resources that might otherwise be directed to the proper execution of the work of the Government." *Iqbal*, 556 U.S. at 685. Additionally, a global stay may protect against "distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service." *Harlow*, 457 U.S. at 816. Further, it could protect an official invoking qualified immunity from feeling obligated "to participate in the process" should discovery as to other parties proceed so as "to ensure the case does not develop in a misleading or slanted way that causes prejudice to their position." *Iqbal*, 556 U.S. at 685. Also, issuing a global stay may help to avoid duplicative depositions.

There are, however, even weightier countervailing interests that often militate against a stay of all discovery for all defendants. As an initial matter, it is essential to recognize that Section 1983 cases frequently involve matters of significant public interest, such as accusations of severe misconduct by government officials against vulnerable members of society. The public writ large has a vested interest in promptly and justly addressing such allegations; delaying the resolution of these cases may negatively impact the public trust and confidence in the legal system.

Additionally, automatically staying all discovery for all defendants would result in habitual and significant delay in the resolution of meritorious claims. Often, "delaying trial would increase the danger of prejudice resulting from the loss of evidence, including the inability of witnesses to recall specific facts, or the possible death of a party." *Clinton*, 520 U.S. at 707–08. Such a delay may hinder the timely gathering of evidence to support the plaintiff's claims with no qualified immunity defense. Moreover, the Court has an interest in the "orderly and expeditious disposition of cases . . . ." *Link v. Wabash R.R. Co.*, 370 U.S. 626, 631 (1962).

Furthermore, Section 1983 cases often involve individuals who assert their rights have been gravely violated. Justice delayed may be justice denied for victims of civil rights abuses. Take the underlying case as an example—here, it is undisputed that a citizen's life was taken by government officials. Whether or not the claims proceed on their merits, the tragedy of the underlying events is certain. Whatever the ultimate resolution, extending the life of this case may only prolong the suffering of Mr. Valencia's loved ones.

Lastly, impeding the timely resolution of Section 1983 cases both deters plaintiffs with legitimate claims from pursuing said claims and hinders systemic reform. If additional barriers are created for such plaintiffs to prove their cases, they may be less likely to pursue justice against the few but pernicious government entities or officials responsible for civil rights violations,

20

undermining accountability for even the worst wrongdoing by rampantly corrupt or cruel public officials. And importantly, civil rights cases can expose systemic issues within government entities or organizations, which is a benefit to all of society. Automatically delaying discovery in civil rights cases where only one claim or one defendant has a qualified immunity defense thus tends to delay the implementation of necessary reforms and changes to prevent future violations.

In addition to the policy concerns outlined above, there are other factors that district courts take into consideration in deciding whether to issue a global stay of discovery: (1) whether the official has already substantially participated in the litigation and discovery process; (2) whether the official's qualified immunity defense would be dispositive of all the claims in the proceeding; and (3) whether the other claims arise out of a common core of operative facts.

Here, Defendants have not presented the Court with good cause to impose upon all defendants a stay based on a defense that has only been invoked by a *single* defendant. For these reasons, the Court finds that in issuing its interlocutory order, the Court appropriately balanced the competing interests in fashioning a stay that stayed discovery related to Defendant Baeza's alleged involvement in the events giving rise to Count VI of Plaintiffs' Amended Complaint but permitted all other discovery to proceed.

## CONCLUSION

For the foregoing reasons, "Defendants Luna County and Lieutenant Arturo Baeza's Motion to Reconsider the Order [Doc. 52] on Defendants' Motion to Stay Discovery [Doc. 25]" [ECF No. 53] is **DENIED**.

_____
**MARGARET STRICKLAND**
UNITED STATES DISTRICT JUDGE