**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

ERNESTINA CRUZ, as personal representative
of the Estate of Gilbert Valencia and G.R.V.,
a minor, through his next friend Marianna
Wheeler,

      Plaintiffs,

v.                                           No. 2:22-cv-00957-MIS-GJF

CITY OF DEMING, *et al.*,

      Defendants.

**ORDER GRANTING DEMING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ON COUNTS I, II, III AND VI OF PLAINTIFF'S FIRST AMENDED
COMPLAINT; DENYING AS MOOT DEFENDANTS LUNA COUNTY AND ARTURO
BAEZA'S MOTION FOR SUMMARY JUDGMENT AND QUALIFIED IMMUNITY
AGAINST COUNTS II, III, AND VI; AND LIFTING STAY**

THIS MATTER is before the Court on Defendants City of Deming, Lee Cook Jordan,

Sergio Quezada, Cristobal Paz, Adam Aragon, Robert Chavez, Benjamin Sanchez, David Acosta,

and Ashley Standridge's (collectively, "Deming Defendants") Motion and Memorandum for

Summary Judgment on Counts I, II, III and VI of Plaintiffs' First Amended Complaint [Doc. 1-1].

ECF No. 59.  Plaintiffs Ernestina Cruz, as personal representative of the estate of Gilbert Valencia,

and Marianna Wheeler on behalf of G.R.V. (collectively, "Plaintiffs") responded and the Deming

Defendants replied.  ECF Nos. 69, 82.  Having considered the parties' submissions, the record,

and the relevant law, the Court will grant the Motion.

**I.      PROCEDURAL BACKGROUND**

Plaintiffs filed the operative First Amended Complaint for Civil Rights Violations,

Violations of the Americans with Disabilities Act (ADA), Assault, Battery, and Negligent Training

and Supervision Resulting in the Wrongful Death of Gilbert Valencia ("Amended Complaint"),

ECF No. 1-1, on December 15, 2022.  The Deming Defendants removed this proceeding to federal court on December 16, 2022.  ECF No. 1.  Relevant here, the Amended Complaint brings claims against the Deming Defendants for: (i) assault and battery resulting in wrongful death under the New Mexico Tort Claims Act ("NMTCA"), N.M. Stat. Ann. § 41-4-1, *et seq.* (brought against the individual Deming officers who fired their weapons at Mr. Valencia ("OIS Officers") and against the City of Deming on the theory of respondeat superior); (ii) negligence resulting in assault and battery and wrongful death under the NMTCA (brought against all of the Deming Defendants on various theories of liability); (iii) negligent training, supervision, and retention under the NMTCA (brought against Defendant City of Deming); and (iv) excessive force under the Fourth and Fourteenth Amendments to the United States Constitution (brought against the OIS Officers and against Defendant Standridge on a theory of failure to intervene).  ECF No. 1-1 ¶¶ 98-117, 120-21, 124-35, 138-39, 184-191, 193-95.  On August 21, 2023, the Deming Defendants filed the instant Motion, arguing that they are entitled to summary judgment as to Count VI of the Amended Complaint because the OIS Officers employed force that was objectively reasonable under the circumstances, see ECF No. 59 at 10-11, and they are entitled to summary judgment as to Counts I through III because the OIS Officers used force that was objectively and subjectively reasonable under New Mexico law, id.  Plaintiffs filed their response on September 25, 2023.  ECF No. 69. The Motion was fully briefed on October 30, 2023, see ECF No. 83, with the filing of the Deming Defendants' reply, see ECF No. 82.

## II.    FACTUAL BACKGROUND

The facts below are undisputed or stated in the light most favorable to Plaintiffs:[1]

---

[1] For purposes of this Motion for Summary Judgment, the Court resolves all doubts against the movant, construes all admissible evidence in the light most favorable to the nonmovant, and draws all reasonable inferences in favor of the nonmovant. See Section III.a *infra*.

On February 3, 2021, at approximately 11:15 a.m., a motorist called 911 and reported a man standing in the median of I-10 in Deming, New Mexico, shooting a "big gun" at westbound traffic. Deming Defendants' Undisputed Material Facts ("DUMF") 1; ECF No. 69 at 6. The caller also reported that the man was wearing a gray sweatsuit and a hat. DUMF 1; ECF No. 69 at 1. Luna County Dispatch ("Dispatch") relayed to officers that shots had been fired from an "AR-Type or Machine-Gun Type" weapon on I-10 by a male wearing all gray with a hat who was aiming at vehicles. DUMF 2; ECF No. 69 at 6. The caller also reported to Dispatch that she was not sure if the gun held by the suspect was real, PUMF 7; ECF No. 82 ¶ 1, but it is not clear whether the caller's uncertainty about the weapon's authenticity was shared with City of Deming law enforcement officers, see ECF No. 69 at 6 (disputing DUMF 4 on the basis that "[o]fficers had different stories and could not confirm if shots had been fired or whether the gun was real" but failing to cite any evidence that law enforcement officers from the City of Deming—as opposed to responding officers from other law enforcement agencies—were aware of the uncertainty about the weapon's authenticity and reports of shots being fired). Luna County Sheriff's Office Lieutenant Arturo Baeza later testified that Luna County Dispatch would have "put out over the air that it was unknown if the individual was shooting at traffic when a vehicle would pass by," see ECF No. 69-3 at 3, 50:10-14, but there is no evidence whether any such message disseminated by Luna County Dispatch would or would not have been received by responding officers from the

---

The Court has chosen to include only proffered facts that are material to the present Motion or helpful for background purposes. To the extent a fact has been omitted, the Court hereby deems such fact immaterial to the present Motion. In addition, per Local Rule 56.1(b), all material facts set forth in the motion for summary judgment and response will be deemed undisputed unless specifically controverted, including those facts to which Plaintiffs have responded with the statement that they "do not have enough information to dispute or not dispute" the fact. D.N.M.LR-Civ. 56.1(b) (stating that "[a]ll material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted); Aguilar v. Las Cumbres Learning, Inc., No. Civ 06-1100 JB/WDS, 2008 WL 4107137, at *21 (D.N.M. Apr. 26, 2008) (stating that a non-movant's response that she was unaware whether a fact was true was insufficient to create a genuine dispute as to that fact at the summary judgment stage).

City of Deming.  Therefore, viewed in the light most favorable to Plaintiffs, the evidence shows that the individual Deming Defendants would have heard that it was unknown if the suspect was shooting at traffic if they had been listening to Luna County Dispatch.

Officers from multiple law enforcement agencies, including the Deming Police Department and Luna County Sheriff's Office, responded to the report of an active shooter and began searching for the suspect.  DUMF 4; ECF No. 69 at 6.  Around 11:48 a.m., Lieutenant Arturo Baeza, who was searching north of I-10, spotted Mr. Valencia, who matched the suspect's description.  DUMF 5-6; ECF No. 69 at 6.[2]  Mr. Valencia was walking approximately 80 to 100 yards away from Lieutenant Baeza and was carrying a weapon that resembled an AR-15 rifle in front of him, pointing it at the ground. Plaintiffs' Undisputed Material Facts Precluding Summary Judgment ("PUMF") 19-20, 23; ECF No. 82 at 2.  Lieutenant Baeza shared Mr. Valencia's location over radio and also radioed that Valencia had "an AR."  DUMF 6; ECF No. 69 at 6.  A short time later, a group of law enforcement officers including Defendants Standridge, Quezada, Paz, Aragon, Chavez, and Sanchez, among others, approached Mr. Valencia in an empty mesquite field north of I-10.  DUMF 7; ECF No. 69 at 6.  Mr. Valencia matched the suspect's description the Deming officers had received because he was wearing gray clothing and a hat and was carrying what appeared to be a rifle slung over his shoulder.  DUMF 8; ECF No. 69 at 6.  The Deming officers believed Mr. Valencia was the suspect described by central dispatch.  DUMF 12; ECF No. 69 at 7.

Defendants Quezada, Paz, Aragon, Chavez, and Sanchez recognized Mr. Valencia from previous interactions they had had with him and were aware that he was mentally ill or unstable.

_____

[2] Plaintiff's response that "Lt. Baeza testified that the individual he saw was carrying what appeared to be an AR-15 in front of him pointing toward the ground," ECF No. 69 at 6, does not create a dispute as to this material fact.

DUMF 10; PUMF 2.  They also were aware that Mr. Valencia had never been violent towards police officers in the past, but he had been violent towards others and could be unpredictable. DUMF 11;  ECF No. 69 at 7.  Additionally, several of the Deming Police Department officers knew from previous encounters with Mr. Valencia that he sometimes carried weapons such as pellet guns and BB guns.  PUMF 3; ECF No. 82 ¶ C.  Following the encounter with Mr. Valencia, the OIS Officers testified that they believed that Mr. Valencia was carrying a real firearm on February 3, 2021, based on its appearance and the communications they had heard from Dispatch. DUMF 13.

As the officers approached Mr. Valencia in the mesquite field, multiple officers shouted different commands at him, and more than one officer yelled at Mr. Valencia to put his hands up. DUMF 14; PUMF 30.  Mr. Valencia momentarily raised his hands in the air above his head, but then he brought his hands down and crossed his arms in front of his chest.  DUMF 15; ECF No. 69 at 7.  Officers resumed yelling at Mr. Valencia to raise his hands, and he complied.  DUMF 16; ECF No. 69 at 7.  Officers then ordered Mr. Valencia to get on his knees, which he did.  DUMFs 17-18; ECF No. 69 at 7.  After getting to his knees, Mr. Valencia touched the gun hanging from his left side with his left hand and moved the gun so that it was positioned in front of his stomach.[3] DUMF 18; ECF No. 69 at 7.  Officers shouted to Mr. Valencia "don't reach for the gun" and "let go," and Mr. Valencia let go of the gun and put his hands back in the air above his head.  DUMF 19; ECF No. 69 at 7.  Officers continued yelling commands at Mr. Valencia, including to keep his hands up, and then to get on his stomach.  DUMF 20; ECF No. 69 at 7. Instead of complying, Mr. Valencia reached his hand into his pocket and withdrew what appeared to be a wallet, flashed it at

---

[3] The parties dispute whether Mr. Valencia "grasped" the gun or not when he moved it around to his front. See DUMF 18; ECF No. 69 at 7; ECF No. 82 ¶ 7.  The Court finds the distinction of whether Mr. Valencia "grasped" the gun or not immaterial to the present Motion.

the officers as if it was a badge, and placed it back in his pocket.  DUMFs 21-22; ECF No. 69 at

7.  Officers again shouted at Mr. Valencia to get on his stomach.  DUMF 23; ECF No. 69 at 7.

 The Deming Defendants and Plaintiffs dispute each other's characterization of the events

that followed.[4]  Footage from Officers Paz and Aragon's body worn cameras, as well as the

declarations of officers Quezada, Paz, Aragon, Chavez, and Sanchez, support the following version

of events, which is not contradicted by any evidence cited by Plaintiffs:  At the time officers yelled

at Mr. Valencia to get on his stomach, he was in a kneeling position, with his hands free and his

weapon on the ground in front of him, slightly off to the side.  See Ex. 6 to ECF No. 69 at 00:52.

Mr. Valencia then looked down, leaned forward slightly, placed his left hand on the weapon near

the barrel, and used his left hand to lift the weapon off the ground and raise it towards his body.

Id. at 00:53.  He then placed his right hand on the weapon closer toward the grip and removed his

left hand from the barrel.  Id. at 00:54.  This motion caused the barrel of the weapon to rotate

towards the officers, although it did not fully rotate so that it was pointing at the officers.  Id. at

00:53-00:54.  Mr. Valencia continued to lean forward, placing his left hand on the ground in front

of him.  Id. at 00:54.  As the barrel of the weapon rotated toward officers, several officers feared

for their safety and for the safety of the officers around them, and they shot Mr. Valencia in

response to the threat.[5]  DUMFs 26-27; PUMF 52; see ECF No. 69 at 8.

---

[4] The parties agree that after officers yelled at Mr. Valencia to get on his stomach a second time, he again
touched his weapon with his left hand, at which point some of the officers fired their weapons at him.  The parties also
agree that Mr. Valencia never directly aimed his weapon at the officers.  PUMF 51; ECF No. 82 ¶ CC.  On one hand,
the Deming Defendants assert that after being ordered to get on his stomach, Mr. Valencia "reached down, grabbed
his weapon by its barrel with his left hand, lifted the weapon off the ground toward his body, then repositioned it from
his left hand into his right hand, grasping the rear of the weapon near the grip."  DUMF 24.  On the other hand,
Plaintiffs assert that Mr. Valencia "leaned forward, was going to the ground, [and] put his left hand on the toy rifle to
move it to the side when DPD officers fired their assault rifles at Mr. Valencia."  PUMF 48.

[5] Plaintiffs attempt to dispute the OIS Officers' subjective interpretation of Mr. Valencia's handling of his
weapon as a threat to their lives and the lives of other officers on the basis that "[t]he video evidence shows that Mr.
Valencia's actions did not pose a threat to police officers."  ECF No. 69 at 8.  The Court finds that the evidence cited

The officers fired a total of 20 times and hit Mr. Valencia approximately 10 times.  DUMF 29; PUMF 52.  After being hit, Mr. Valencia collapsed on his back and ultimately died from the gunshot wounds he sustained.  DUMF 30.  It was later determined that the weapon Mr. Valencia was carrying was a Crosman airsoft gun with an orange tip that had been painted black.  DUMF 32 at 8; ECF No. 69 at 9.  The weapon had several features indicating that it was not an operable firearm, such as residual orange paint on the muzzle, a missing handguard on the forward section of the barrel, an empty magazine well, and no stock or buffer tube attached to the rear of the gun.  PUMF 40.[6]  A New Mexico State Police investigation conducted after the incident located casings from the officers who had shot at Mr. Valencia at distances ranging from 31 to 40 feet from where Mr. Valencia collapsed.  DUMF 31; ECF No. 69 at 8.  The entire encounter between Mr. Valencia and law enforcement officers in the mesquite field lasted at least 44 seconds.  PUMF 41; ECF No. 82 ¶ Z.

### III.   LEGAL STANDARDS

#### a.   Rule 56

Rule 56 of the Federal Rules of Civil Procedure allows summary judgment when the evidence submitted by the parties establishes that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the movant

---

by Plaintiffs fails to create a material dispute about the OIS Officers' subjective interpretations of Mr. Valencia's actions.

[6] The Deming Defendants dispute PUMF 40 and the expert opinion contained therein on the basis that it is "immaterial" but do not offer other grounds for disputing this fact.

meets this burden, the nonmovant is required to put in the record facts showing that there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-52 (1986).  A fact is "material" if under the substantive law it is essential to the proper disposition of the claim.  Id. at 248.

The nonmoving party cannot rely upon conclusory allegations or contentions of counsel to defeat summary judgment.  See Pueblo Neighborhood Health Ctrs., Inc. v. Losavio, 847 F.2d 642, 649 (10th Cir. 1988).  Rather, the nonmovant has a responsibility to "go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to [their] case in order to survive summary judgment."  Johnson v. Mullin, 422 F.3d 1184, 1187 (10th Cir. 2005) (quoting McKnight v. Kimberly Clark Corp., 149 F.3d 1125, 1128 (10th Cir. 1998)).

It is not the court's role to weigh the evidence or assess the credibility of witnesses in ruling on a motion for summary judgment.  See Daniels v. United Parcel Serv., Inc., 701 F.3d 620, 627 (10th Cir. 2012).  Rather, the court resolves all doubts against the movant, construes all admissible evidence in the light most favorable to the nonmovant, and draws all reasonable inferences in favor of the nonmovant.  See Hunt v. Cromartie, 526 U.S. 541, 551–52 (1999); see also Garrison v. Gambro, Inc., 428 F.3d 933, 935 (10th Cir. 2005).  However, summary judgment may nevertheless be granted where "the evidence is merely colorable, or is not significantly probative."  Liberty Lobby, Inc., 477 U.S. at 249-50.

### b.  Qualified Immunity Standard

The doctrine of qualified immunity protects government officials sued in their individual capacity from monetary damages unless their actions violate a "clearly established" statutory or constitutional right.  City of Escondido v. Emmons, 586 U.S. --- , 139 S. Ct. 500, 503 (2019)

(quoting Kisela v. Hughes, 584 U.S. --- , 138 S. Ct. 1148, 1152 (2018)).  A right is clearly established only when, at the time of the challenged conduct, "the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he [or she] was violating it."  Plumhoff v. Rickard, 572 U.S. 765, 778–79 (2014).

"A plaintiff can demonstrate that a constitutional right is clearly established by reference to cases from the Supreme Court, the Tenth Circuit, or the weight of authority from other circuits." Gann v. Cline, 519 F.3d 1090, 1092 (10th Cir. 2008) (quoting Anderson v. Blake, 469 F.3d 910, 914 (10th Cir. 2006)) (internal quotation marks omitted).  "The rule must be settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority." District of Columbia v. Wesby, 583 U.S. 48, 63 (2018) (internal citations and quotation marks omitted).  Although the plaintiff is not required to identify a case directly on point, "existing precedent must have placed the statutory or constitutional question beyond debate."  Kisela, 138 S. Ct. at 1152 (quoting White v. Pauly, 580 U.S. 73, 79 (2017)).  Clearly established law cannot be defined "at a high level of generality"; rather, it must be particularized to the facts of the case. Ashcroft v. al-Kidd, 563 U.S. 731, 742 (2011); see Anderson v. Creighton, 483 U.S. 635, 640 (1987).  But "officials can still be on notice that their conduct violates established law even in novel factual circumstances."  Quinn v. Young, 780 F.3d 998, 1005 (10th Cir. 2015) (quoting Cortez v. McCauley, 478 F.3d 1108, 1115 (10th Cir. 2007)).  The dispositive question is whether the unlawfulness of the official's actions was apparent in light of pre-existing law.  Creighton, 483 U.S. at 640.

When a defendant asserts qualified immunity at the summary judgment stage, "the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right, and (2) the constitutional right was clearly established."  Kapinski v. City of Albuquerque, 964 F.3d 900, 905

(10th Cir. 2020) (quoting <u>Koch v. City of Del City</u>, 660 F.3d 1228, 1238 (10th Cir. 2011)).  The

court may address these two inquiries in any order.  <u>Pearson v. Callahan</u>, 555 U.S. 223, 236 (2009);

<u>McCowan v. Morales</u>, 945 F.3d 1276, 1282 (10th Cir. 2019).  If the plaintiff fails to satisfy either

test, the court must grant qualified immunity.  <u>McCowan</u>, 945 F.3d at 1282 (quoting <u>Est. of</u>

<u>Ceballos v. Husk</u>, 919 F.3d 1204, 1212–13 (10th Cir. 2019)).  If the plaintiff succeeds, then—and

only then—does the defendant bear the traditional burden of the movant for summary judgment.

<u>Kapinski</u>, 964 F.3d at 905.

## IV.   DISCUSSION

The Court begins with the Deming Defendants' arguments pertaining to the federal claims

against them in Count VI before turning to their arguments pertaining to the state law claims in

Counts I, II, and III.

### a.   Count VI – Excessive Force

In Count VI, Plaintiff alleges the OIS Officers behaved in an objectively unreasonable

manner when they surrounded Mr. Valencia with their firearms aimed at him, "scream[ed]" at him

despite knowing that he suffered from mental health issues, and ultimately discharged their

firearms at him.  <u>See</u> ECF No. 1-1 ¶¶ 188-89.  Plaintiff also alleges Defendant Standridge failed

to take reasonable steps to intervene to protect Mr. Valencia from the OIS Officers' excessive

force.  <u>Id.</u> ¶ 192.

The Fourth Amendment guarantees citizens the right to be "secure in their persons . . .

against unreasonable . . . seizures." U.S. Const. Amend. IV.  To bring a claim for an unlawful

seizure through excessive force under the Fourth Amendment, a plaintiff must show both that a

seizure occurred and that the seizure was unreasonable.  <u>Thomas v. Durastanti</u>, 607 F.3d 655, 663

(10th Cir. 2010).  Because Mr. Valencia was shot by Deming law enforcement officers, there is no

question that there was a seizure.  See Torres v. Madrid, 592 U.S. --- , 141 S. Ct. 989, 994 (2021); see also Reavis Est. of Coale v. Frost, 967 F.3d 978, 985 (10th Cir. 2020) ("[A]pprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." (quoting Tennessee v. Garner, 471 U.S. 1, 7 (1985))).  Accordingly, the Court's analysis focuses on whether the officers' seizure of Mr. Valencia was unreasonable.

Whether force is unreasonable under the Fourth Amendment requires "a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." Graham v. Connor, 490 U.S. 386, 396 (1989). Courts accomplish this balancing function by undertaking an objective inquiry which asks "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 397 (citing, inter alia, Scott v. United States, 436 U.S. 128, 137–139 (1978)); see also United States v. Salas-Garcia, 698 F.3d 1242, 1248 (10th Cir. 2012).  Specific factors relevant to the unreasonable force inquiry are: (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight.  Id. at 396.  Of these three "Graham factors," the second is generally the most important to determine if a use of force was reasonable.  Palacios v. Fortuna, 61 F.4th 1248, 1256 (10th Cir. 2023) (citing Est. of Valverde ex rel. Padilla v. Dodge, 967 F.3d 1049, 1060 (10th Cir. 2020)).  However, these factors are "nonexclusive and not dispositive" because "the inquiry remains focused on the totality of the circumstances." Id.

Courts judge the reasonableness of force used "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id.  In addition, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make

split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Kisela, 138 S. Ct. at 1152. Additional factors relevant to the excessive force inquiry are whether the officers' own conduct during the seizure unreasonably necessitated their use of force, whether the officers were in danger at the precise moment they used force, and the mentally ill or disturbed condition of the suspect. Ceballos, 919 F.3d at 1214 (citing, inter alia, Hastings v. Barnes, 252 F. App'x 197, 203 (10th Cir. 2007) and Giannetti v. City of Stillwater, 216 F. App'x 756, 764 (10th Cir. 2007)).

Officers' use of lethal force is not unreasonable under the Fourth Amendment if officers "ha[d] probable cause to believe that the suspect pose[d] a threat of serious physical harm, either to the officer or to others." Id. (citing Garner, 471 U.S. at 11); Ceballos, 919 F.3d at 1213 (stating that "officers are not justified in using deadly force unless objectively reasonable officers in the same position 'would have had probable cause to believe that there was a threat of serious physical harm to themselves or to others'" (quoting Thomson v. Salt Lake Cnty., 584 F.3d 1304, 1313 (10th Cir. 2009))).

Applying the forgoing principles to the undisputed facts at hand, the Court finds that the OIS Officers are entitled to qualified immunity because their use of lethal force to apprehend Mr. Valencia was objectively reasonable. Because the Court determines that the officers' use of force did not violate Mr. Valencia's constitutional rights, the Court does not address the 'clearly established' prong of the qualified immunity analysis.

> i.    *The OIS Officers' use of force was not excessive.*

The first Graham factor—the severity of the crime at issue—weighs in favor of the OIS Officers. "When the crime at issue is a felony, regardless of whether the felony is violent or nonviolent, the crime is considered to have a high degree of severity which weighs against the

plaintiff."  Palacios, 61 F.4th at 1256 (citing Vette v. K-9 Unit Deputy Sanders, 989 F.3d 1154, 1170 (10th Cir. 2021)).  Here, Dispatch relayed to the OIS Officers that a man wearing gray clothing and a hat had been standing near I-10 and firing shots from an "AR-Type or Machine-Gun Type" weapon at vehicles.  When the OIS Officers encountered Mr. Valencia, he was wearing gray clothing and a hat and carrying what appeared to be rifle.  Although the officers' belief that Mr. Valencia had shot at vehicles was ultimately proven to be mistaken, in an excessive force analysis, an officer's mistaken belief does not defeat qualified immunity so long as it is reasonable.  Palacios, 61 F.4th at 1255.  Under the circumstances, the officers' belief that Mr. Valencia was the suspect described by Dispatch and had been shooting an AR-type weapon at highway traffic was manifestly reasonable.  Thus, this factor weighs in favor of the OIS Officers.  See id. at 1256.

In so finding, the Court is unpersuaded by Plaintiffs' argument that there was "no evidence that Mr. Valencia had committed a crime."  See ECF No. 69 at 21-23.  The eyewitness report that a man was shooting an AR-type weapon at vehicles on I-10 that was shared with the OIS Officers by Dispatch, and the fact that Mr. Valencia matched the description of the suspect relayed by Dispatch, constituted evidence that Mr. Valencia had committed a crime.  Plaintiffs point out that the eyewitness also reported to dispatch that she was not sure if the weapon she had seen the suspect holding was real.  Id. at 21-22.  Although there is no direct evidence that the eyewitness's statement about her uncertainty about the weapon was real was relayed to the OIS Officers, even assuming it had been, this would not contradict a finding that the officers believed they were responding to a reported crime of significant severity.  Plaintiffs' arguments to the contrary conflate the issues of whether an arrest was supported by probable cause and whether an arrest constituted excessive force.  See Fogarty v. Gallegos, 523 F.3d 1147, 1160 (10th Cir. 2008) ("Although we have concluded that [the plaintiff's] arrest was not supported by probable cause,

this does not mean that the force used to arrest him was automatically excessive, as the two inquiries are entirely independent.").

With respect to the third Graham factor—whether the suspect was actively resisting arrest or attempting to evade arrest by flight—there is no evidence that Mr. Valencia was actively resisting arrest or trying to evade arrest by fleeing.  Therefore, this factor weighs in favor of Plaintiffs.

The Court turns to the second Graham factor, which is whether the suspect posed an immediate threat to the safety of officers or others.  Graham, 490 U.S. at 396.  To evaluate this factor, the Tenth Circuit has identified the following four sub-factors as "aids" in making the ultimate determination of whether a use of lethal force was reasonable: (1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect.  See Valverde, 967 F.3d at 1061.

Under the first sub-factor, if a suspect is given orders and does not comply, this weighs in the officers' favor.  Palacios, 61 F.4th at 1259.  Here, although Mr. Valencia complied with some of the officers' commands, such as to raise his hands and to get on his knees, he disobeyed other orders from the officers.  For example, it is undisputed that in the events immediately preceding the officers' fatal shooting of Mr. Valencia, officers had ordered Mr. Valencia to show his hands, keep his hands up, or a variation of those actions, at least 15 times.  DUMF 33.  Officers also ordered Mr. Valencia to not touch his weapon at least five times.  DUMF 34.  Mr. Valencia disobeyed officers' orders when he lowered his hands at least four separate times in order to cross his arms, touch his weapon, retrieve his wallet, and grab his weapon.  DUMF 36.  Most

significantly, immediately before he was shot, Mr. Valencia grabbed his weapon despite being ordered to not touch it.

Mr. Valencia also made hostile motions toward the officers with his weapon.  Mr. Valencia twice disobeyed officers' orders by touching and grabbing his weapon while under orders to keep his hands up.  Additionally, when Mr. Valencia picked up his weapon from the ground immediately before he was shot and shifted the position of his hands on the barrel, that motion caused the barrel to rotate towards the officers.  It is reasonable for officers to perceive a suspect's act of picking up a firearm after being told not to touch the firearm and manipulating it in a way that causes the barrel to move towards officers as a hostile motion.  See Valverde, 967 F.3d at 1063-64 (collecting cases for the proposition that the law permits officers to employ lethal force when a suspect picks up a gun, even when the actions of the suspect holding the gun are ambiguous); Thomson, 584 F.3d at 1319 (finding that it was not objectively unreasonable for an officer to shoot a man when it "would have been virtually impossible for [the officer] to ascertain whether [the man's] gun simply was moving upward or if it was coming down to be aimed at [the officer] again"); see also Est. of Larsen ex rel. Sturdivan v. Murr, 511 F.3d 1255, 1260 (10th Cir. 2008) (stating that "[a] reasonable officer need not await the 'glint of steel' before taking self-protective action" (quotation omitted)); cf. Phillips v. James, 422 F.3d 1075, 1084 (10th Cir. 2005) (stating that it was reasonable for an officer to shoot a man before the man had pointed a gun at an officer or even raised a gun, where the man had repeatedly refused to cooperate with officers or put down his weapon, had threatened to shoot officers, and had yelled at officers that he had a clean shot).

With respect to the third sub-factor, which is the distance separating the OIS Officers and Mr. Valencia, it is undisputed that: (1) casings were located a range of 31 to 40 feet from the location where Mr. Valencia collapsed, and (2) that the casings' distance from Mr. Valencia does

not conclusively establish the OIS Officers' distance from Mr. Valencia at the time they fired.  See PUMF 53; ECF No. 82 at 5.  Although the officers' exact distance from Mr. Valencia at the time they shot him is unknown, the bodycam videos establish that the officers encountered Mr. Valencia in a mesquite field in which they could not have taken cover from any shots fired by an armed suspect.  See, e.g., ECF No. 69-4 at 25:03; ECF No. 69-6 at 00:26.  Although the Court notes that the body camera footage is consistent with the officers being in the ballpark of 31 to 40 feet from Mr. Valencia at the time they shot him, given the lack of conclusive evidence and sparse argument on the distance between the officers and Mr. Valencia, the Court does not weigh the distance separating the officers from Mr. Valencia in favor of either Plaintiffs or the officers.  However, the Court finds that the officers' lack of cover when they encountered Mr. Valencia in the mesquite field weighs in favor of officers.  See Est. of Taylor v. Salt Lake City, 16 F.4th 744, 770 (10th Cir. 2021); cf. Pauly v. White, 874 F.3d 1197, 1209 (10th Cir. 2017) (the fact that an officer had cover behind a wall 50 feet from the location of a suspect weighed against the reasonableness of the officer's conduct).

Finally, under the fourth sub-factor the Court considers the manifest intentions of the suspect.  To do so, the Court focuses on how a reasonable officer would have perceived the suspect's manifest—rather than subjective—intentions.  Taylor, 16 F.4th at 770.  Plaintiffs argue that Mr. Valencia's manifest intention was to comply with the officers' orders "at all times," because Mr. Valencia did not "engage in any hostile actions towards officers [or] attempt to flee or ignore officers' confusing commands."  See ECF No. 69 at 28-34.  Plaintiffs also hypothesize that the reason Mr. Valencia grabbed his weapon as he was leaning forward was to "move it to the side so that he did not have to lie on top of it while on the ground."  Id. at 28.

The Court disagrees with Plaintiffs' characterization of Mr. Valencia's actions as manifestly compliant with the officers' commands "at all times." It is true that Mr. Valencia was partially compliant with the officers; he put his hands in the air, knelt down, and appeared to be in the process of laying down on his stomach at the time he was shot. However, he also failed to comply with the officers' orders in multiple instances, for example, after being told to put his hands up, he lowered his hands to cross his arms over his chest, and later he again lowered his hands to retrieve his wallet from his pocket and show it to the officers. More importantly, at the time the OIS Officers shot him, Mr. Valencia had grabbed his weapon despite having been previously ordered to not touch it. Despite Plaintiffs' speculation that Mr. Valencia was just moving the gun out of the way, precedent establishes that officers do not behave unreasonably by shooting a suspect who pulls out a firearm when the officers do not yet know what the suspect intends to do with the firearm. Valverde, 967 F.3d at 1062 ("Perhaps a suspect is just pulling out a weapon to discard it rather than to fire it. But waiting to find out what the suspect planned to do with the weapon could be suicidal."). Mr. Valencia's action of grabbing a weapon the officers reasonably perceived to be an AR-style rifle after he had been told to not grab it was a manifestly hostile action.

Plaintiffs also argue that because Mr. Valencia had a history of mental illness and of "carrying . . . toy guns, a jury could conclude that these officers should have known it was more likely that the rifle Mr. Valencia possessed on February 3, 2021, was, in fact, a toy and that he posed no threat to officers." ECF No. 69 at 25. The Court disagrees that the OIS Officers could not reasonably have believed that Mr. Valencia posed a threat to them because of his known history of mental illness and of carrying what Plaintiffs characterize as "toy guns." The OIS Officers knew that although Mr. Valencia had never been violent with a law enforcement officer in the past,

he had been violent with other individuals.  Additionally, the OIS Officers knew that Mr. Valencia had wielded weapons such as pellet guns and BB guns on previous occasions.  Even though Valencia was not known to have carried an operable AR-style weapon previously, given the OIS officers' knowledge that Valencia had previously demonstrated violent behavior, was known to carry weapons, Dispatch's report that the suspect was carrying an "AR-Type or Machine-Gun Type" weapon, Defendant Baeza's radio message that Valencia was carrying an AR, and the visual similarities between the airsoft gun carried by Valencia and an AR-style firearm, the Court finds that the OIS officers reasonably believed that the weapon carried by Mr. Valencia was real and that Mr. Valencia might fire at them.  See Tanner v. San Juan Cnty. Sheriff's Off., 864 F. Supp. 2d 1090, 1135 (D.N.M. 2012) ("Courts generally give officers more leniency in the excessive force context when they have specific information available to them indicating that a suspect has engaged in violent behavior in the past.").  Additionally, given the short duration and tense nature of the encounter with Mr. Valencia, the Court does not find that the Officers were unreasonable in their belief that the weapon carried by Mr. Valencia was an operable AR-type weapon notwithstanding its visual incongruencies with an operable firearm.  Accordingly, a jury could not reasonably find that the OIS Officers were unreasonable in believing that Mr. Valencia posed a threat to them and demonstrated hostile intentions by rotating the barrel of his gun toward them. In summary, the second Graham factor, which is especially weighty in cases involving deadly force, weighs strongly in favor of the OIS Officers.  See Hicks v. Scott, 958 F.3d 421, 435 (6th Cir. 2020) (stating that "[w]hen an officer uses deadly force, the critical factor is whether the suspect presented an immediate danger to the officers or others").

Finally, the Court disagrees with Plaintiffs' contention that officers unreasonably escalated the situation, thereby creating the need to use lethal force.  The Court takes into account in its

excessive force analysis whether the officers' "own reckless or deliberate conduct during the seizure unreasonably created the need to use such force." Thomson, 584 F.3d at 1320 (quoting Allen v. Muskogee, Okla., 119 F.3d 837, 840 (10th Cir. 1997)) (internal quotations omitted). The officers' conduct is only actionable if it rises to the level of "recklessness," and such conduct is only relevant if it is "immediately connected" to the threat. Id.; Taylor, 16 F.4th at 771 (stating that "it is important to underscore that '[m]ere negligent actions precipitating a confrontation would not, of course, be actionable under § 1983'")(citation omitted). Plaintiff argues that the OIS Officers acted recklessly because "despite being acutely aware of Mr. Valencia's mental illness, [they] created a chaotic scene by shouting multiple commands at Mr. Valencia," they "failed to consider that designating one person to engage with Mr. Valencia would reduce confusion and likely avoid the tragedy," and they did not give Mr. Valencia a "clear directive to get on his stomach but to not touch [his weapon] while doing so." ECF No. 69 at 36. In the Court's view, the commands shouted by the officers at Mr. Valencia did not recklessly precipitate their ultimate use of lethal force, since one would expect officers encountering an armed suspect to shout the types of commands the OIS Officers did here. In addition, because officers had ordered Mr. Valencia to not touch his weapon at least twice before they ordered him to get on his stomach, the Court finds no basis for concluding that their failure to do so a third time was reckless. Finally, to the extent Mr. Valencia was confused during his encounter with the officers, even if designating a single person to communicate with Mr. Valencia may have reduced his confusion, the law does not require officers to have approached a tense and rapidly evolving situation with a plan that hindsight reveals would have been the wisest. Cf. Graham, 490 U.S. at 397 (explaining that courts are to approach the excessive force inquiry from the viewpoint of what was reasonable in the moment, and from the viewpoint of "the peace of a judge's chambers"). Under the circumstances,

the officers' actions do not rise to the level of recklessness.  Cf. Yates v. City of Cleveland, 941 F.2d 444, 447 (6th Cir. 1991) ("An officer who intentionally enters a dark hallway in the entrance of a private residence in the middle of the night, and fails to give any indication of his identity, is more than merely negligent.").

Therefore, having considered the Graham factors and having concluded that the OIS officers did not unreasonably escalate their encounter with Mr. Valencia, the Court finds that the OIS Officers are entitled to qualified immunity because their use of force when apprehending Mr. Valencia was not objectively unreasonable.

> ii.    *Because the OIS Officers did not commit a constitutional deprivation, Plaintiffs' supervisory liability claim necessarily fails.*

In Count VI, Plaintiffs also bring a supervisory liability claim against Defendant Standridge based on her alleged "fail[ure] to take reasonable steps to intervene or protect Gilbert Valencia from the objectively unreasonable use of force of the other defendants despite being in a position to do so."  See ECF No. 1-1 at ¶ 192.  Under § 1983, an officer may be liable for failing to intervene to stop another officer's use of excessive force.  Mick v. Brewer, 76 F.3d 1127, 1136 (10th Cir. 1996).  Supervisory liability claims fail where there is no underlying constitutional deprivation.  Bruner-McMahon v. Hinshaw, 846 F. Supp. 2d 1177, 1207 (D. Kan. 2012) ("Absent an underlying constitutional violation, plaintiffs cannot assert a supervisory liability claim." (citing, inter alia, Fogarty, 523 F.3d at 1162)).  For the reasons explained above, the Court has found that the OIS Officers did not use excessive force.  Because the OIS Officers did not commit a constitutional violation, the supervisory liability claim against Defendant Standridge fails.

> **b.    Counts I through III - State Tort Claims**

The Deming Defendants also request summary judgment on the three state tort claims Plaintiffs bring against them under the NMTCA in Counts I through III.

> *i.    Count I – Assault and Battery Resulting in Wrongful Death*

In Count I, Plaintiffs allege a claim for assault and battery resulting in wrongful death against the OIS Officers and City of Deming.  See ECF No. 1-1 ¶¶ 98- 110.  The NMTCA protects Defendants from tort liability unless Plaintiffs can establish that one of the NMTCA's immunity waivers applies.   See N.M. Stat. Ann. § 41-4-4 (granting immunity from tort liability for "governmental entit[ies] and any public employee while acting within the scope of duty . . . except as waived by Sections 41-4-5 through 41-4-12").  Here, Plaintiffs bring Count I pursuant to the immunity waiver contained in Section 41-4-12.  Id. ¶ 107.  In relevant part, Section 41-4-12 waives immunity for "wrongful death . . . resulting from assault [or] battery . . . when caused by law enforcement officers while acting within the scope of their duties.  N.M. Stat. Ann. § 41-4-12.

Under New Mexico state law, which incorporates the Restatement (Second) of Torts, the elements for civil battery are: "(a) [an] act[ ] intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) an offensive contact with the person of the other directly or indirectly results."  Hernandez v. Parker, 508 P.3d 947, 957 (N.M. Ct. App. 2022) (quoting Restatement (Second) of Torts § 18 (Am. L. Inst. 1965)).  To prove an assault, plaintiffs must show that "the actor . . . intend[ed] to cause another to be put in imminent apprehension of harmful or offensive contact, but the contact need not occur."  Id. (quoting Restatement (Second) of Torts § 21).

A Court's determination that officers' use of force was not constitutionally suspect under the Fourth Amendment does not preclude a plaintiff from succeeding on civil assault or battery

claims under the NMTCA, because the standards for excessive force under the Fourth Amendment and for civil assault and battery under New Mexico tort law are not the same. Id. While the Fourth Amendment inquiry is one of objective reasonableness, New Mexico law provides that officers' use of force is privileged when the force is both subjectively and objectively "reasonably necessary in the enforcement of law and the preservation of order." Reynaga v. Cnty. of Bernalillo, 64 F.3d 670, 1995 WL 503973, at *2 (10th Cir. 1995)(table); Hernandez, 508 P.3d at 958. Only if an officer uses more than necessary force will the officer commit an unprivileged assault or battery on a suspect. See Reynaga, 1995 WL 503973, at *2; Mead v. O'Connor, 344 P.2d 478, 479 (N.M. 1959) (holding that officers are entitled to use such force as is reasonably necessary under the circumstances to arrest a person for a misdemeanor or to conserve the peace). Under the subjective and objective inquiry, an officer must subjectively believe that he or she used no more force than necessary, but the officer's judgment is compared to that of a hypothetical reasonable police officer placed in the same situation. Hernandez, 508 P.3d at 958 (quoting 6 Am. Jur. 2d, Assault and Battery § 104 (2021)). While the qualified immunity analysis for a federal claim shifts the burden of proof to the plaintiff, for tort claims under the NMTCA, defendants bear the burden of establishing the 'defense' that the force used was reasonable and privileged. Id. at 959.

Here, the Court finds that the OIS Officers' use of lethal force to arrest Mr. Valencia was reasonably necessary from an objective and subjective standpoint. As discussed previously, the undisputed facts show that the OIS Officers used force that was objectively reasonable: they encountered Mr. Valencia while searching for a suspect who had been reported to have been shooting an AR-type weapon at vehicles; Mr. Valencia matched the suspect's description due to his clothing and the weapon he was carrying; Mr. Valencia was not fully compliant with the Officers' commands; and immediately before the Officers shot Mr. Valencia, he had disobeyed

their orders by grabbing his weapon a second time, and he had manipulated it in a way that caused the barrel to rotate in their direction.  As for the subjective inquiry, the OIS Officers reasonably viewed the way Mr. Valencia handled his weapon immediately before he was shot as a threat to their lives or the lives of other responding officers.  Accordingly, the Court finds that the OIS Officers used force that was objectively and subjectively reasonable to seize Mr. Valencia under the circumstances and was therefore privileged.  Consequently, the OIS Officers are entitled to summary judgment on Count I.

ii.     Count II– Negligence Resulting in Assault and Battery and Wrongful Death

In Count II, Plaintiffs allege a claim for negligence resulting in assault and battery and wrongful death against all the Deming Defendants.  See ECF No. 1-1 ¶¶ 111-117, 120-121, 124-131.  As discussed, these Defendants are immune from tort liability under the NMTCA unless one of the NMTCA's immunity waivers applies.  Negligence is not one of the enumerated torts in Section 41-4-12, so Section 41-4-12 does not waive immunity for claims of negligence standing alone.  See N.M. Stat. Ann. 41-4-12; Caillouette v. Hercules, Inc., 827 P.2d 1306, 1311 (N.M. Ct. App. 1992) (stating that for Section 41-4-12 to apply, "the negligence complained of must cause a specified tort or violation of rights; immunity is not waived for negligence standing alone").  Here, all of the claims against the Deming Defendants in Count II are premised upon the OIS Officers having committed an assault or battery.  See ECF No. 1-1 ¶ 116, 127.  Because the Court has found that the OIS Officers did not commit an assault or battery because their force was privileged, Count II necessarily fails.

*iii.      Count III – Negligent Training, Supervision, and Retention*

In Count III, Plaintiffs bring a Negligent Training, Supervision, and Retention claim against the City of Deming.  ECF No. 1-1 ¶¶ 132-35, 138-39.   However, Plaintiffs may not rely on the waiver of immunity contained in Section 41-4-12 to bring this claim, because Section 41-4-12 only applies to "law enforcement officers," and Defendant City of Deming is not a "law enforcement officer" within the meaning of Section 41-4-12.  N.M. Stat. Ann. 41-4-12; see also id. § 41-4-3(D) (defining "law enforcement officer" as "a full-time salaried public employee of a governmental entity, or a certified part-time salaried police officer employed by a governmental entity, whose principal duties under law are to hold in custody any person accused of a criminal offense, to maintain public order or to make arrests for crimes, or members of the national guard when called to active duty by the governor").  Moreover, as explained above, Mr. Valencia was not subjected to an assault or battery upon which a negligence claim could be premised.  See Caillouette, 827 P.2d at 1311.  Therefore, Count III must also be dismissed.

## V.      CONCLUSION

For the foregoing reasons, the Deming Defendants' Motion for Summary Judgment on Counts I, II, III and VI of Plaintiffs' First Amended Complaint (ECF No. 59) is **GRANTED**.

Furthermore, the Court's holdings that: (1) the OIC Officers did not use constitutionally excessive force to arrest Mr. Valencia under the Fourth Amendment, and (2) the OIC Officers did not commit an assault or battery of Mr. Valencia under New Mexico law are fully dispositive of the claims brought against Defendants Luna County and Arturo Baeza in Counts II, III, and VI, as these claims are premised upon either an unreasonable use of force by the OIS Officers (in the case

of Count VI) or an underlying assault or battery (in the cases of Counts II and III).[7]  Accordingly,

**IT IS ORDERED** as follows:

(i)       Defendants Chavez, Quezada, Paz, Aragon, Sanchez, Standridge, and Baeza are entitled to qualified immunity as to Count VI;

(ii)      Defendants Chavez, Quezada, Paz, Aragon, Sanchez, and the City of Deming are entitled to summary judgment on Count I;

(iii)     the Deming Defendants and Defendant Baeza are entitled to summary judgment on Count II;

(iv)     Defendants City of Deming and Luna County are entitled to summary judgment on Count III;

(v)      Defendants Luna County and Lieutenant Arturo Baeza's Motion and Memorandum in Support of Summary Judgment and Qualified Immunity against Counts II, III, and VI (ECF No. 25) is **DENIED AS MOOT**; and

(vi)     the discovery stay imposed by the Court's November 15, 2023, Minute Order Granting Deming Defendants' Motion to Stay Discovery is **LIFTED**.

Plaintiffs' claims in Counts IV, V, VII, and VIII remain.

      **IT IS SO ORDERED.**

_____
**MARGARET STRICKLAND**
UNITED STATES DISTRICT JUDGE

---

[7] The Court's analysis of these claims against Defendants Luna County and Baeza would be duplicative of the Court's analysis in Sections IV.a.ii and IV.b.ii-iii, *supra*, which the Court does not repeat here.