**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

ERNESTINA CRUZ, as personal representative
of the Estate of Gilbert Valencia, and
G.R.V., a minor, through next friend
Marianna Wheeler,

      Plaintiffs,

v.

                                    2:22-cv-00957-MIS-GJF

CITY OF DEMING, et al.,

      Defendants.

<u>**ORDER GRANTING DEMING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ON COUNTS IV, V, VII, AND VIII OF PLAINTIFFS' FIRST AMENDED
COMPLAINT**</u>

      **THIS MATTER** is before the Court on the City of Deming and Deming Police Officers

Sergio Quezada, Cristobal Paz, Adam Aragon, Robert Chavez, Benjamin Sanchez, and Ashley

Standridge's ("Deming Defendants") Motion for Summary Judgment on Counts IV, V, VII, and

VIII of Plaintiffs' First Amended Complaint, ECF No. 97, filed February 29, 2024.  Plaintiffs

Ernestina Cruz, as personal representative of the Estate of Gilbert Valencia, and G.R.V., a minor,

through his next friend Marianna Wheeler, filed a Response on April 11, 2024, ECF No. 101, to

which the Deming Defendants filed a Reply on April 25, 2024, ECF No. 102.  Upon review of the

Parties' submissions, the record, and the relevant law, the Court will **GRANT** the Motion.

## I.      PROCEDURAL BACKGROUND

      On December 15, 2022, Plaintiffs filed the operative First Amended Complaint in New

Mexico state court.  ECF No. 1-1.  On December 16, 2022, the Deming Defendant removed this

proceeding to federal district court.  ECF No. 1.  The First Amended Complaint asserts the

following claims against the Deming Defendants:

- Count I: assault and battery resulting in wrongful death under the New Mexico Tort Claims Act ("NMTCA"), N.M. Stat. Ann. § 41-4-1, et seq., against the City of Deming and the individual Deming Police Officers who fired their weapons at Mr. Valencia, and specifically Defendants Chavez, Quezada, Paz, Aragon, and Sanchez ("OIS Officers"), ECF No. 1-1 ¶¶ 98-110;

- Count II: negligence resulting in assault and battery and wrongful death under the NMTCA against all Deming Defendants, id. ¶¶ 111-31;

- Count III: negligent training, supervision, and retention under the NMTCA against the City of Deming, id. ¶¶ 132-39;

- Count IV: a violation of Title II of the Americans with Disabilities Act ("ADA") against the City of Deming, id. ¶¶ 140-65;

- Count V: a violation of Section 504 of the Rehabilitation Act against the City of Deming, id. ¶¶ 166-83;

- Count VI: violations of the Fourth and Fourteenth Amendments to the United States Constitution, brought pursuant to 42 U.S.C. § 1983, against (a) the OIS Officers under a theory of excessive force, and (b) Defendant Standridge under a theory of failure to intervene (supervisory liability), id. ¶¶ 184-95;

- Count VII: a violation of the Fourteenth Amendment to the U.S. Constitution, brought pursuant to 42 U.S.C. § 1983, against the OIS Officers and Defendant Standridge under a theory of deliberate indifference to serious medical needs for failure to ensure reasonable safety and provide adequate medical care, id. ¶¶ 196-208; and

- Count VIII: a municipal liability claim, brought pursuant to 42 U.S.C. § 1983, against the City of Deming under the theories of (a) failure to properly train police on interacting with

people with mental disabilities and (b) having a custom, policy, and practice of accepting, condoning, or ratifying a failure to implement crisis intervention for people experiencing mental health crises, id. ¶¶ 209-21.

On August 21, 2023, the Deming Defendants filed a Motion for Summary Judgment as to Counts I, II, III, and VI.  ECF No. 59.

On December 12, 2023, the Court issued an Order granting the Deming Defendants' Motion for Summary Judgment on Counts I, II, III, and VI.  ECF No. 92 ("prior Summary Judgment Order").  The Court first found that the OIS Officers were entitled to qualified immunity as to Count VI because their use of lethal force to apprehend Mr. Valencia was objectively reasonable under the circumstances, id. at 20; and because there was no underlying constitutional violation, Defendant Standridge was entitled to summary judgment to the extent Count VI alleged a supervisory liability claim for failure to intervene, id.  The Court further found that the OIS Officers were entitled to summary judgment as to Count I because their use of force was objectively and subjectively reasonable under New Mexico law.  Id. at 22-23.  The Court also found that the Deming Defendants were entitled to summary judgment as to Count II because no assault or battery occurred.  Id. at 23.  Finally, the Court found that the City of Deming was entitled to summary judgment as to Count III because (1) it was entitled to sovereign immunity and, in any event, (2) there was no assault or battery upon which a negligence claim could be premised, id. at 24.

On February 29, 2024, the Deming Defendants filed the instant Motion for Summary Judgment on Counts IV, V, VII, and VIII.  ECF No. 97.  Plaintiffs filed a Response, ECF No. 101, to which the Deming Defendants filed a Reply, ECF No. 102.

## II.      FACTUAL BACKGROUND

Pursuant to Local Rule 7.1(a), the Deming Defendants incorporate by reference the facts contained in the Court's prior Summary Judgment Order as the undisputed material facts applicable to the current Motion.  ECF No. 97 at 2.  As such, the Court adopts the factual recitation in its prior Order and repeats it here for consistency:

> The facts below are undisputed or stated in the light most favorable to Plaintiffs:[1]
>
> On February 3, 2021, at approximately 11:15 a.m., a motorist called 911 and reported a man standing in the median of I-10 in Deming, New Mexico, shooting a "big gun" at westbound traffic.  Deming Defendants' Undisputed Material Facts ("DUMF") 1; ECF No. 69 at 6.  The caller also reported that the man was wearing a gray sweatsuit and a hat.  DUMF 1; ECF No. 69 at 1.  Luna County Dispatch ("Dispatch") relayed to officers that shots had been fired from an "AR-Type or Machine-Gun Type" weapon on I-10 by a male wearing all gray with a hat who was aiming at vehicles.  DUMF 2; ECF No. 69 at 6.  The caller also reported to Dispatch that she was not sure if the gun held by the suspect was real, PUMF 7; ECF No. 82 ¶ 1, but it is not clear whether the caller's uncertainty about the weapon's authenticity was shared with City of Deming law enforcement officers, see ECF No. 69 at 6 (disputing DUMF 4 on the basis that "[o]fficers had different stories and could not confirm if shots had been fired or whether the gun was real" but failing to cite any evidence that law enforcement officers from the City of Deming—as opposed to responding officers from other law enforcement agencies—were aware of the uncertainty about the weapon's authenticity and reports of shots being fired).  Luna County Sheriff's Office Lieutenant Arturo Baeza later testified that Luna County Dispatch would have "put out over the air that it was unknown if the individual was shooting at traffic when a vehicle would pass by," see ECF No. 69-3 at 3, 50:10-14,  but there is no evidence whether any such message disseminated by Luna County Dispatch would or would not have been

---

[1]       For purposes of this Motion for Summary Judgment, the Court resolves all doubts against the movant, construes all admissible evidence in the light most favorable to the nonmovant, and draws all reasonable inferences in favor of the nonmovant. See Section III.a infra.

The Court has chosen to include only proffered facts that are material to the present Motion or helpful for background purposes. To the extent a fact has been omitted, the Court hereby deems such fact immaterial to the present Motion.  In addition, per Local Rule 56.1(b), all material facts set forth in the motion for summary judgment and response will be deemed undisputed unless specifically controverted, including those facts to which Plaintiffs have responded with the statement that they "do not have enough information to dispute or not dispute" the fact. D.N.M.LR-Civ. 56.1(b) (stating that "[a]ll material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted; Aguilar v. Las Cumbres Learning, Inc., No. Civ 06-1100 JB/WDS, 2008 WL 4107137, at *21 (D.N.M. Apr. 26, 2008) (stating that a non-movant's response that she was unaware whether a fact was true was insufficient to create a genuine dispute as to that fact at the summary judgment stage).

received by responding officers from the City of Deming. Therefore, viewed in the light most favorable to Plaintiffs, the evidence shows that the individual Deming Defendants would have heard that it was unknown if the suspect was shooting at traffic if they had been listening to Luna County Dispatch.

Officers from multiple law enforcement agencies, including the Deming Police Department and Luna County Sheriff's Office, responded to the report of an active shooter and began searching for the suspect. DUMF 4; ECF No. 69 at 6. Around 11:48 a.m., Lieutenant Arturo Baeza, who was searching north of I-10, spotted Mr. Valencia, who matched the suspect's description. DUMF 5-6; ECF No. 69 at 6.[2] Mr. Valencia was walking approximately 80 to 100 yards away from Lieutenant Baeza and was carrying a weapon that resembled an AR-15 rifle in front of him, pointing it at the ground. Plaintiffs' Undisputed Material Facts Precluding Summary Judgment ("PUMF") 19-20, 23; ECF No. 82 at 2. Lieutenant Baeza shared Mr. Valencia's location over radio and also radioed that Valencia had "an AR." DUMF 6; ECF No. 69 at 6. A short time later, a group of law enforcement officers including Defendants Standridge, Quezada, Paz, Aragon, Chavez, and Sanchez, among others, approached Mr. Valencia in an empty mesquite field north of I-10. DUMF 7; ECF No. 69 at 6. Mr. Valencia matched the suspect's description the Deming officers had received because he was wearing gray clothing and a hat and was carrying what appeared to be a rifle slung over his shoulder. DUMF 8; ECF No. 69 at 6. The Deming officers believed Mr. Valencia was the suspect described by central dispatch. DUMF 12; ECF No. 69 at 7.

Defendants Quezada, Paz, Aragon, Chavez, and Sanchez recognized Mr. Valencia from previous interactions they had had with him and were aware that he was mentally ill or unstable. DUMF 10; PUMF 2. They also were aware that Mr. Valencia had never been violent towards police officers in the past, but he had been violent towards others and could be unpredictable. DUMF 11; ECF No. 69 at 7. Additionally, several of the Deming Police Department officers knew from previous encounters with Mr. Valencia that he sometimes carried weapons such as pellet guns and BB guns. PUMF 3; ECF No. 82 ¶ C. Following the encounter with Mr. Valencia, the OIS Officers testified that they believed that Mr. Valencia was carrying a real firearm on February 3, 2021, based on its appearance and the communications they had heard from Dispatch. DUMF 13.

As the officers approached Mr. Valencia in the mesquite field, multiple officers shouted different commands at him, and more than one officer yelled at Mr. Valencia to put his hands up. DUMF 14; PUMF 30. Mr. Valencia momentarily raised his hands in the air above his head, but then he brought his hands down and crossed his arms in front of his chest. DUMF 15; ECF No. 69 at 7. Officers resumed yelling at Mr. Valencia to raise his hands, and he complied. DUMF 16;

---

[2]     Plaintiff's response that "Lt. Baeza testified that the individual he saw was carrying what appeared to be an AR-15 in front of him pointing toward the ground," ECF No. 69 at 6, does not create a dispute as to this material fact.

5

ECF No. 69 at 7. Officers then ordered Mr. Valencia to get on his knees, which he did. DUMFs 17-18; ECF No. 69 at 7. After getting to his knees, Mr. Valencia touched the gun hanging from his left side with his left hand and moved the gun so that it was positioned in front of his stomach.[3] DUMF 18; ECF No. 69 at 7. Officers shouted to Mr. Valencia "don't reach for the gun" and "let go," and Mr. Valencia let go of the gun and put his hands back in the air above his head. DUMF 19; ECF No. 69 at 7. Officers continued yelling commands at Mr. Valencia, including to keep his hands up, and then to get on his stomach. DUMF 20; ECF No. 69 at 7. Instead of complying, Mr. Valencia reached his hand into his pocket and withdrew what appeared to be a wallet, flashed it at the officers as if it was a badge, and placed it back in his pocket. DUMFs 21-22; ECF No. 69 at 7. Officers again shouted at Mr. Valencia to get on his stomach. DUMF 23; ECF No. 69 at 7.

The Deming Defendants and Plaintiffs dispute each other's characterization of the events that followed.[4] Footage from Officers Paz and Aragon's body worn cameras, as well as the declarations of officers Quezada, Paz, Aragon, Chavez, and Sanchez, support the following version of events, which is not contradicted by any evidence cited by Plaintiffs: At the time officers yelled at Mr. Valencia to get on his stomach, he was in a kneeling position, with his hands free and his weapon on the ground in front of him, slightly off to the side. See Ex. 6 to ECF No. 69 at 00:52. Mr. Valencia then looked down, leaned forward slightly, placed his left hand on the weapon near the barrel, and used his left hand to lift the weapon off the ground and raise it towards his body. Id. at 00:53. He then placed his right hand on the weapon closer toward the grip and removed his left hand from the barrel. Id. at 00:54. This motion caused the barrel of the weapon to rotate towards the officers, although it did not fully rotate so that it was pointing at the officers. Id. at 00:53-00:54. Mr. Valencia continued to lean forward, placing his left hand on the weapon in front of him. Id. at 00:54. As the barrel of the weapon rotated toward officers, several officers feared for their safety and for the safety of the officers around them, and they shot Mr. Valencia in response to the threat.[5] DUMFs 26-27; PUMF 52; see ECF No. 69 at 8.

---

[3]       The parties dispute whether Mr. Valencia "grasped" the gun or not when he moved it around to his front. See DUMF 18; ECF No. 69 at 7; ECF No. 82 ¶ 7. The Court finds the distinction of whether Mr. Valencia "grasped" the gun or not immaterial to the present Motion.

[4]       The parties agree that after officers yelled at Mr. Valencia to get on his stomach a second time, he again touched his weapon with his left hand, at which point some of the officers fired their weapons at him. The parties also agree that Mr. Valencia never directly aimed his weapon at the officers. PUMF 51; ECF No. 82 ¶ CC. On one hand, the Deming Defendants assert that after being ordered to get on his stomach, Mr. Valencia "reached down, grabbed his weapon by its barrel with his left hand, lifted the weapon off the ground toward his body, then repositioned it from his left hand into his right hand, grasping the rear of the weapon near the grip." DUMF 24. On the other hand, Plaintiffs assert that Mr. Valencia "leaned forward, was going to the ground, [and] put his left hand on the toy rifle to move it to the side when DPD officers fired their assault rifles at Mr. Valencia." PUMF 48.

[5]       Plaintiffs attempt to dispute the OIS Officers' subjective interpretation of Mr. Valencia's handling of his weapon as a threat to their lives and the lives of other officers on the basis that "[t]he video evidence shows that Mr. Valencia's actions did not pose a threat to police officers." ECF No. 69 at 8. The Court finds that the evidence

The officers fired a total of 20 times and hit Mr. Valencia approximately 10 times.  DUMF 29; PUMF 52.  After being hit, Mr. Valencia collapsed on his back and ultimately died from the gunshot wounds he sustained.  DUMF 30.  It was later determined that the weapon Mr. Valencia was carrying was a Crosman airsoft gun with an orange tip that had been painted black.  DUMF 32 at 8; ECF No. 69 at 9.  The weapon had several features indicating that it was not an operable firearm, such as residual orange paint on the muzzle, a missing handguard on the forward section of the barrel, an empty magazine well, and no stock or buffer tube attached to the rear of the gun.  PUMF 40.[6]  A New Mexico State Police investigation conducted after the incident located casings from the officers who had shot at Mr. Valencia at distances ranging from 31 to 40 feet from where Mr. Valencia collapsed.  DUMF 31; ECF No. 69 at 8.  The entire encounter between Mr. Valencia and law enforcement officers in the mesquite field lasted at least 44 seconds.  PUMF 41; ECF No. 82 ¶ Z.

ECF No. 92 at 2-7 (footnotes in original).[7]

## III.    LEGAL STANDARDS

### a.        Rule 56

Rule 56 of the Federal Rules of Civil Procedure allows summary judgment when the evidence submitted by the parties establishes that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine

---

cited by Plaintiffs fails to create a material dispute about the OIS Officers' subjective interpretations of Mr. Valencia's actions.

[6]        The Deming Defendants dispute PUMF 40 and the expert opinion contained therein on the basis that it is "immaterial" but do not offer other grounds for disputing this fact.

[7]        Plaintiffs' Response to the instant Motion contains a section of "Undisputed Material Facts."  ECF No. 101 at 10-11.  All but one of these facts appear in Plaintiffs' Response to the Deming Defendants' Motion for Summary Judgment as to Counts I, II, III, and VI.  See ECF No. 69 at 9-15, ¶¶ 1, 30, 35-38, 42-47, 49-50, 52.  As such, to the extent that they are relevant, they are incorporated into the Court's recitation of the undisputed facts.
        The one fact that did not appear in Plaintiffs' Response to the Deming Defendants' Motion for Summary Judgment as to Counts I, II, III, and VI states: "Upon the commencement of firing, Mr. Valencia fell forward and rolled to the right coming to rest on his back; head towards the officers."  ECF No. 101 at 11, ¶ 14.  Although the Deming Defendants do not dispute this fact, ECF No. 102 at 6, the Court finds that it is immaterial.  And in any event, the Court's recitation of the facts states that "Mr. Valencia collapsed on his back . . . ."  ECF No. 92 at 7.

issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the movant meets this burden, the nonmovant is required to put in the record facts showing that there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-52 (1986).  A fact is "material" if under the substantive law it is essential to the proper disposition of the claim.  Id. at 248.

The nonmoving party cannot rely upon conclusory allegations or contentions of counsel to defeat summary judgment.  See Pueblo Neighborhood Health Ctrs., Inc. v. Losavio, 847 F.2d 642, 649 (10th Cir. 1988).  Rather, the nonmovant has a responsibility to "go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to [their] case in order to survive summary judgment."  Johnson v. Mullin, 422 F.3d 1184, 1187 (10th Cir. 2005) (quoting McKnight v. Kimberly Clark Corp., 149 F.3d 1125, 1128 (10th Cir. 1998)).

It is not the court's role to weigh the evidence or assess the credibility of witnesses in ruling on a motion for summary judgment.  See Daniels v. United Parcel Serv., Inc., 701 F.3d 620, 627 (10th Cir. 2012), abrogated on other grounds by Muldrow v. City of St. Louis, Mo., __ U.S. __, 144 S. Ct. 967, 975 (2024).  Rather, the court resolves all doubts against the movant, construes all admissible evidence in the light most favorable to the nonmovant, and draws all reasonable inferences in favor of the nonmovant.  See Hunt v. Cromartie, 526 U.S. 541, 551–52 (1999); see also Garrison v. Gambro, Inc., 428 F.3d 933, 935 (10th Cir. 2005).  However, summary judgment may nevertheless be granted where "the evidence is merely colorable, or is not significantly probative."  Liberty Lobby, Inc., 477 U.S. at 249-50 (internal citations omitted).

### b.  Qualified Immunity Standard

The doctrine of qualified immunity protects government officials sued in their individual capacity from liability for monetary damages unless their actions violate a "clearly established" statutory or constitutional right.  City of Escondido v. Emmons, 586 U.S. 38, 42 (2019) (quoting Kisela v. Hughes, 584 U.S. 100, 104 (2018)).  A right is clearly established only when, at the time of the challenged conduct, "the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he [or she] was violating it." Plumhoff v. Rickard, 572 U.S. 765, 778–79 (2014).

"A plaintiff can demonstrate that a constitutional right is clearly established 'by reference to cases from the Supreme Court, the Tenth Circuit, or the weight of authority from other circuits.'" Gann v. Cline, 519 F.3d 1090, 1092 (10th Cir. 2008) (quoting Anderson v. Blake, 469 F.3d 910, 914 (10th Cir. 2006)) (internal quotation marks omitted).  "The rule must be settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority." District of Columbia v. Wesby, 583 U.S. 48, 63 (2018) (internal citations and quotation marks omitted).  Although the plaintiff is not required to identify a case directly on point, "existing precedent must have placed the statutory or constitutional question beyond debate."  Kisela, 584 U.S. at 104 (quoting White v. Pauly, 580 U.S. 73, 79 (2017)).  Clearly established law cannot be defined "at a high level of generality"; rather, it must be particularized to the facts of the case. Ashcroft v. al-Kidd, 563 U.S. 731, 742 (2011); see also Anderson v. Creighton, 483 U.S. 635, 640 (1987).  But "officials can still be on notice that their conduct violates established law even in novel factual circumstances."  Quinn v. Young, 780 F.3d 998, 1005 (10th Cir. 2015) (quoting Cortez v. McCauley, 478 F.3d 1108, 1115 (10th Cir. 2007)).  The dispositive question is whether

the unlawfulness of the official's actions was apparent in light of pre-existing law.  See Creighton, 483 U.S. at 640.

When a defendant asserts qualified immunity at the summary judgment stage, "the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right, and (2) the constitutional right was clearly established."  Kapinski v. City of Albuquerque, 964 F.3d 900, 905 (10th Cir. 2020) (quoting Koch v. City of Del City, 660 F.3d 1228, 1238 (10th Cir. 2011)).  The court may address these two inquiries in any order.  Pearson v. Callahan, 555 U.S. 223, 236 (2009); McCowan v. Morales, 945 F.3d 1276, 1282 (10th Cir. 2019).  If the plaintiff fails to satisfy either test, the court must grant qualified immunity.  McCowan, 945 F.3d at 1282 (quoting Est. of Ceballos v. Husk, 919 F.3d 1204, 1212–13 (10th Cir. 2019)).  If the plaintiff succeeds, then—and only then—does the defendant bear the traditional burden of the movant for summary judgment.  Kapinski, 964 F.3d at 905.

## IV.    DISCUSSION

The Deming Defendants argue that the finding in the Court's prior Summary Judgment Order that their conduct was objectively reasonable is dispositive of the remaining claims against them.  ECF No. 97 at 3.

Plaintiffs argue that the Court's finding that the Deming Defendants' conduct was objectively reasonable was "in error" because the Court "weighed the evidence presented and made factual determinations which should have been left to a jury[.]"  ECF No. 101 at 2.  Specifically, they argue that "despite a dispute about the material fact about whether Mr. Valencia pointed the toy rifle at officers, this Court went on to weigh the evidence and make factual determinations."  Id. at 6 (citing ECF No. 92 at 6; ECF No. 69-5).  They ask that the Court "re-address plaintiffs' claims that the officers' continued use of force, after Mr. Valencia was first shot

and had already been subdued, constituted excessive use of force." Id. at 6 (citing ECF No. 69 at 14, 32).

To the extent the Response could be construed as requesting reconsideration of the prior Summary Judgment Order, the request is denied. The Court resolved all doubts against Defendants, construed all admissible evidence in the light most favorable to Plaintiffs, and drew all reasonable inferences in Plaintiffs' favor. ECF No. 92 at 2 n.2; see also id. at 4 ("[V]iewed in the light most favorable to Plaintiffs, the evidence shows that the individual Deming Defendants would have heard that it was unknown if the suspect was shooting at traffic if they had been listening to Luna County Dispatch."); id. at 7 (observing that Mr. Valencia's "weapon had several features indicating that it was not an operable firearm, such as residual orange paint on the muzzle, a missing handguard on the forward section of the barrel, an empty magazine well, and no stock or buffer tube attached to the rear of the gun").

Plaintiffs' assertion that a dispute exists as to whether Mr. Valencia pointed his weapon at the officers is simply false. The Court explicitly stated that "[t]he parties . . . agree that Mr. Valencia never directly aimed his weapon at the officers." Id. at 6 n.4 (citing PUMF 51; ECF No. 82 ¶ CC). And, citing to the body cam video footage of the incident, the Court observed that when Mr. Valencia placed his hand on the weapon, it "caused the barrel of the weapon to rotate towards the officers, although it did not fully rotate so that it was pointing at the officers." Id. at 6 (citing Ex. 6 to ECF No. 69 at 00:53-00:54). Because it is undisputed that Mr. Valencia did not point his weapon at the officers, the Court's description of the body cam footage cannot fairly be characterized as "weigh[ing] the evidence." ECF No. 101 at 2. Rather, as the Deming Defendants correctly note: "Consistent with Supreme Court precedent, the Court simply 'viewed the facts in

the light depicted by the videotape' which neither party claims depicts something other than what actually occurred." ECF No. 102 at 3 (quoting <u>Scott v. Harris</u>, 550 U.S. 372, 378, 380-81 (2007)).

The Court declines Plaintiffs' invitation to reconsider their claim "that the officers' continued use of force, after Mr. Valencia was first shot and had already been subdued, constituted excessive use of force." ECF No. 101 at 6. Plaintiffs are correct that continuing to fire shots at a suspect may constitute the excessive use of force if the officers "had 'enough time . . . to recognize and react to' the fact that [the suspect] no longer posed a threat . . . ." <u>Est. of Smart v. City of Wichita</u>, 951 F.3d 1161, 1176 (10th Cir. 2020) (quoting <u>Fancher v. Barrientos</u>, 723 F.3d 1191, 1201 (10th Cir. 2013)). However, "[c]ourts are particularly deferential to the split-second decisions police must make in determining precisely when a deadly threat has passed." <u>Id.</u>

In its prior Summary Judgment Order, the Court analyzed the Deming Defendants' conduct, as depicted by the body-cam footage, under the factors espoused in <u>Graham v. Connor</u>, 490 U.S. 386, 396 (1989), and found that the officers' actions were objectively reasonable under the circumstances. ECF No. 92 at 12, 20. Implicit in this finding was that a reasonable jury could not conclude that the officers had enough time to recognize and react to changed circumstances after the first shot was fired at Mr. Valencia.[8] The video—which establishes that less than three seconds elapsed from the first shot to the final shot—confirms this finding. <u>See</u> <u>Palacios v. Fortuna</u>, 61 F.4th 1248, 1261 (10th Cir. 2023) (rejecting the plaintiff's argument that the "officers had enough time (three seconds) to stop shooting when [the suspect] fell onto his side after the first shots were fired, before rolling onto his back" because "[a] reasonable officer would not

---

[8]     In their Response to the Deming Defendants' Motion for Summary Judgment on Counts I, II, III, and VI of Plaintiff's First Amended Complaint, one of Plaintiffs' theories of excessive force was "shooting a man who was not an active shooter or committing a crime and continuing to shoot a clearly subdued and compliant man." ECF No. 69 at 21.

perceive that the threat had ended and that [the suspect] was effectively subdued merely because he fell, given that he repeatedly maintained possession of a gun").

The cases Plaintiffs' cite are inapposite.  In <u>Smart</u>, there was evidence that before the officer fired the final three shots at the suspect (who he believed had fired a gun into a large crowd), the suspect had fallen "to the ground, had his arms outstretched with his empty hands visible, and looked back at [the officer] and shook his head."  951 F.3d at 1176.  And other eyewitnesses "had time to perceive that [the suspect] did not pose a threat."  <u>Id</u>.  The Tenth Circuit found that a reasonable jury could conclude that the officer "violated [the suspect's] right to be free from excessive force by firing the final shots at [the suspect] after [the officer] had had 'enough time…to recognize and react to' the fact that [the suspect] no longer posed a threat (if in fact he ever <u>did</u> pose a threat)."  <u>Id</u>. (quoting <u>Fancher</u>, 723 F.3d at 1201).

In <u>Fancher</u>, a suspect jumped into an officer's patrol car which contained two loaded guns. 723 F.3d at 1196.  As the officer reached in and tried to remove his keys from the ignition, the suspect shifted the vehicle into reverse.  <u>Id</u>. at 1196–97.  The officer shot the suspect in the chest, saw the suspect slump, and "was sure" he had hit the suspect.  <u>Id</u>. at 1196.  When the car began to roll backwards, the officer stepped out of the way.  <u>Id</u>. at 1197.  "Five to seven seconds" later, the officer fired a second series of shots, killing the suspect.  <u>Id</u>.  The district court denied qualified immunity as to the second series of shots.  <u>Id</u>. at 1193.  The Tenth Circuit affirmed, reasoning the suspect was clearly incapacitated by the time the officer fired the second series of shots, and the officer had "enough time . . . to recognize and react to the changed circumstances and cease firing his gun."  <u>Id</u>. at 1201.

In <u>Perea v. Baca</u>, officers attempted to detain a man they were performing a welfare check on and who posed no threat to them.  817 F.3d 1198, 1201, 1204 (10th Cir. 2016).  When the man

began to struggle, one officer shot the man in the chest with a taser, which did not subdue him.  Id. at 1201.  In less than two minutes, the officer tased the man nine additional times.  Id.  "At some point before the taserings stopped, [the officers] were able to get [the man] on the ground on his stomach, with both officers on top of him, effectively subduing him."  Id.  The man died shortly after the tasings.  Id.  The Tenth Circuit held that "[t]he repeated use of the taser against a subdued offender is clearly unreasonable and constitutes excessive force under the Fourth Amendment." Id. at 1204.

In Dixon v. Richer, an officer conducted a traffic stop of a van because he believed the occupants had information regarding the whereabouts of a person who caused a disturbance at a local bar.  922 F.2d 1456, 1458, 1462 (10th Cir. 1991).  The officer instructed the driver to put his hands against the van and move his legs away from the van.  Id. at 1458.  Although the driver complied, the officer kicked the driver in the instep of his foot causing him intense pain.  Id.  When another officer arrived, one of the officers, without warning, kicked the driver so forcefully that he started to fall.  Id.  An officer then hit him in the stomach with a metal flashlight and, once he was on the ground, the officers "got on top of him and began to beat and choke him."  Id.  The Tenth Circuit found that the officers' conduct was not objectively reasonable under the Fourth Amendment, and affirmed the district court's denial of qualified immunity.  Id. at 1463.

Finally, in McCoy v. Meyers, "the post-restraint force occurred after [the suspect] was rendered unconscious, handcuffed, and zip-tied."  887 F.3d 1034, 1050 (10th Cir. 2018).  The Tenth Circuit found that a reasonable jury could conclude that the suspect "was unconscious long enough to be handcuffed, zip-tied, and moved from a prone, face-down position into a sitting position, and that the [officers] nevertheless struck him over 10 times and placed him into a second carotid

14

restraint upon reviving him[,]" and that the officers "should have been able 'to recognize and react to the changed circumstances.'"  Id. (quoting Fancher, 723 F.3d at 1201).

The undisputed facts of this case are materially distinguishable from those in Smart, Fancher, Perea, Dixon, and McCoy.  Here, the body-cam footage shows that immediately before the officers shot Mr. Valencia he had disobeyed their orders by touching his weapon and manipulating it in a way that caused the barrel to rotate in the officers' direction.  At that point, the officers fired upon Mr. Valencia in rapid succession—less than three seconds elapsed from the first shot to the last.  "While it is possible that an initial reasonable decision to use deadly force may become unreasonable later, these facts do not support that conclusion."  Palacios, 61 F.4th at 1261.  The Court finds that a reasonable jury could not conclude that the officers had enough time to recognize and react to changed circumstances after the first shot was fired at Mr. Valencia.  See id.

The Court now turns to whether the Deming Defendants are entitled to summary judgment on the remaining claims against them.

### a.   Counts IV (ADA) and V (Rehabilitation Act)

The City of Deming argues that it is entitled to summary judgment as to Counts IV and V of the Amended Complaint because the officers' actions "were an objectively reasonable response to a threat of harm and not the result of discrimination against Mr. Valencia's mental illness."  ECF No. 97 at 4; see also id. at 5-6 (citing Gohier v. Enright, 186 F.3d 1216, 1222 (10th Cir. 1999); Est. of Holmes v. Somers, 387 F. Supp. 3d 1233, 1264 (D. Kan. 2019); Trujillo v. Rio Arriba Cnty. ex rel. Rio Arriba Cnty. Sheriff's Dep't, 319 F.R.D. 571, 614 (D.N.M. 2016)).

Plaintiffs argue that the officers violated the ADA and Rehabilitation Act by arresting Mr. Valencia for legal conduct related to his disability.  ECF No. 101 at 13 (citing Glover v. City of Wilmington, 966 F. Supp. 2d 417, 428-29 (D. Del. 2013); Lewis v. Truitt, 960 F. Supp. 175, 178

(S.D. Ind. 1997)).  They further argue that the City violated the ADA and Rehabilitation Act by failing to properly train officers to deal with people with mental illnesses.  Id. at 14-15 (citing Gohier, 186 F.3d at 1222; Felix v. City of New York, 344 F. Supp. 3d 644, 666 (S.D.N.Y. 2018); Buben v. City of Lone Tree, Civil Action No. 08–cv–00127–WYD–MEH, 2010 WL 3894185, at *12 (D. Colo. Sept. 30, 2010)).

In their Reply, Defendants maintain that "a use of force that is objectively reasonable—as the Deming Defendant's actions were—is, by its very nature, nondiscriminatory."  ECF No. 102 at 7.  They argue that the Tenth Circuit has not adopted the "wrongful arrest" theory of discrimination Plaintiffs rely on.  Id. at 7-8.  They further argue that, in any event, this case is distinguishable from the cases that have applied it because "this matter involved force used in response to an apparent threat of imminent harm[,]" and pursuant to Gohier, reasonable force under such circumstances is neither an arrest nor an ADA/Rehabilitation Act violation.  Id. at 8 (citing Gohier, 186 F.3d at 1222).  They further argue that the

> Deming Defendants did not misperceive lawful conduct by Mr. Valencia as criminal activity. They confronted Mr. Valencia because he had unlawfully pointed a gun at freeway traffic. See NMSA 1978, § 30-3-1(B) (defining assault as "any unlawful act, threat or menacing conduct which causes another person to reasonably believe that he is in danger of receiving an immediate battery.") As such, even if Mr. Valencia's conduct were the result of a disability, it warranted a police response.

Id. (citing Gohier, 186 F.3d at 1221-22).  They further argue that "there is no evidence in the record to suggest that officers knew or should have known that Mr. Valencia's non-compliance in handling his weapon when confronted was the result of a disability[,]" and that in previous dealings with Mr. Valencia he had generally followed orders despite his mental illness.  Id. at 8-9.  They further argue that because Mr. Valencia's rights were not violated, the city cannot be held liable for failure to train or supervise.  Id. at 9 (citing J.H. v. Bernalillo Cnty., 806 F.3d 1255, 1262 (10th Cir. 2015)).

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a). Because the language of these two provisions is substantially similar, claims under both acts are generally analyzed together. See Cohon ex rel. Bass v. N.M. Dep't of Health, 646 F.3d 717, 725-26 (10th Cir. 2011); Sutherlin v. Indep. Sch. Dist. No. 40 or Nowata Cnty., Okla., 960 F. Supp. 2d 1254, 1265 (N.D. Okla. 2013). For purposes of the instant Motion, the Parties agree that Title II of the ADA and Section 504 of the Rehabilitation Act apply to law enforcement arrests. See ECF No. 97 at 4; ECF No. 101 at 13. See also Gohier, 186 F.3d at 1221.

The general standard for analyzing claims under Title II of the ADA requires the plaintiff to prove:

(1) that he [or she] is a qualified individual with a disability;

(2) that he [or she] was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and

(3) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability.

Gohier, 186 F.3d at 1219. In Gohier, the Tenth Circuit stated that "[t]his general standard, which closely tracks the statute's language, is plainly correct." Id.

However, the Tenth Circuit further observed that "[f]ederal courts have addressed Title II claims arising from arrests under two different theories." Id. at 1220. "The first is that police wrongly arrested someone with a disability because they misperceived the effects of that disability as criminal activity." Id. (citing Lewis, 960 F. Supp. at 176-77; Jackson v. Inhabitants of the Town of Sanford, Civ. No. 94–12–P–H, 1994 WL 589617, at *1 (D. Me. Sept. 23, 1994)). To recover under this "wrongful arrest" theory, the plaintiff must prove that "(1) he was disabled, (2) the defendants knew or should have known that he was disabled, and (3) the defendants arrested him because of legal conduct related to his disability." Id. at 1220 (quoting Lewis, 960 F. Supp. at 178). The second theory is that "while police properly investigated and arrested a person with a disability for a crime unrelated to that disability, they failed to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees." Id. at 1220-21 (citations omitted).

Here, Plaintiffs rely on the wrongful arrest theory. ECF No. 101 at 13. In Gohier, the Tenth Circuit declined to adopt this theory, leaving its viability an open question in this circuit. 186 F.3d at 1221. However, the Court agrees with Defendants that even assuming arguendo that the wrongful arrest theory is viable, Gohier precludes relief under the facts of this case.

In Gohier, an officer responded to a report that a man on foot was striking cars with a baseball bat and pipe. Id. at 1217. The dispatcher described the suspect. Id. Soon after the report, the officer saw a man ("Lucero"), who did not match the dispatcher's description of the suspect, in the vicinity of the reported incidents walking down the middle of an avenue that had no streetlights. Id. The officer turned on his highbeams and overhead flashing lights, but Lucero kept walking with his right hand clutched to his chest. Id. The officer identified himself and asked Lucero to talk to him, but Lucero kept walking. Id. at 1218. The officer yelled "Police, stop!" Id.

18

At that point, Lucero stopped 30 to 35 feet from the officer, put his right hand behind his back, and began walking toward the officer at a fast pace.  Id.  The officer described Lucero as "'crazed and wild-eyed,' with his teeth gritted in a grimace and a 'Charles Manson-type look.'"  Id.  The officer drew his pistol, pointing it toward the ground at a 45-degree angle, and ordered Lucero to show his hands.  Id.  However, Lucero continued walking quickly toward him with his right hand hidden.  Id.  The officer then leveled his pistol at Lucero and again shouted at him to show his hands.  Id.  "Still advancing, Lucero raised his right hand from behind his back and began repeatedly swinging it down and forward in a stabbing motion.  He held a long, slender object that [the officer] thought was a knife."  Id.  "Around this time, [the officer] decided that Lucero was mentally ill."  Id.  The officer retreated several steps behind his car while repeatedly ordering Lucero to "drop the knife" or "drop it."  Id.  Lucero did not comply with the order and instead moved to the driver's side door of the car.  Id.  Lucero said to the officer, "Do you like your car? It's gone."  Id.  When he began to open the car door, the officer moved forward to stop him.  Id.  Lucero then let go of the door and either stepped or lunged toward the officer, making a stabbing motion with the object.  Id.  The officer shot him twice, killing him.  Id.

Lucero's personal representative sued the officer and the City of Colorado Springs under Section 1983 for excessive force and failure to train, respectively.  Id.  After the defendants moved for summary judgment, the plaintiff moved to amend her complaint to add a claim that the City violated Title II of the ADA "by failing to treat and protect Lucero in light of his disability, paranoid schizophrenia, which contributed to the very unfortunate end of his encounter with [the officer]."  Id. at 1217.

The district court first issued an order granting the defendants' motion for summary judgment on the 1983 claims.  Id.  It found that the officer was entitled to qualified immunity on

the excessive-force claim, and because he had not violated the victim's federal rights, the City could not be liable under 1983.  Id.  The district court issued a second order denying the plaintiff's motion to amend, finding that amendment would be futile because a person with a disability cannot state a claim under Title II the ADA based on police conduct during an arrest (or other encounter with police).  Id. at 1218, 1220.  The plaintiff appealed both orders.  See id. at 1217.

The Tenth Circuit initially found that the district court's broad finding that a person with a disability can never state a claim under Title II the ADA based on police conduct during an arrest (or other encounter with police) "is not the law."  Id. at 1221.  It described the two theories federal courts have applied to Title II claims arising from arrests and found that assuming that both are viable, neither applied to the facts before it.  Id.  Relevant here, the Tenth Circuit found that the wrongful arrest theory was inapplicable because the officer "did not misperceive lawful conduct caused by Mr. Lucero's disability as criminal activity and then arrest him for that conduct.  Lucero's conduct was not lawful, and [the officer] did not arrest him."  Id. at 1222.  Rather,

> [the officer] used force on Lucero not to effect an arrest, but to defend himself from a perceived threat. When he shot Lucero, he reasonably thought it necessary to do so to avoid serious harm or death. We take judicial notice that Lucero may not have been criminally responsible under Colorado law for his unlawful conduct,[9] and assume that said conduct was the unfortunate result of a "disability" in terms of the ADA. Nonetheless, whether or not [the officer] would have formally arrested Lucero, had that been possible, and whether or not a jury would ultimately have convicted Lucero of any crime, [the officer's] use of force in self-defense is simply unlike the wrongful arrests [in Lewis and Jackson].  Those men's conduct did not warrant the police response at issue in those cases, i.e., arrest. Lucero's threatening conduct, however, did warrant the police response at issue in this case, i.e., the use of force in self-defense.

---

[9]    See Colo.Rev.Stat. §§ 16–8–101.5, –103, –104.5, –105.5 (1999) (governing crimes committed after June 1995); see also, e.g., People v. Chavez, 629 P.2d 1040, 1047 (Colo. 1981) (en banc) (explaining that one who pleads not guilty by reason of insanity "'admits the acts charged, but denies criminal culpability'" on grounds that "mental disease or defect . . . relieves him of criminal responsibility for his conduct" (quoting Leick v. People, 136 Colo. 535, 322 P.2d 674, 681 (1958))).

Id.

The same reasoning applies here. The officers' use of force on Mr. Valencia was not to affect an arrest, but to defend themselves against a perceived threat. See ECF No. 92 at 12-20. The Court has found that the officers' use of force was objectively reasonable under the circumstances. See id. at 20. Because the officers' use of force was a reasonable response to a perceived threat, the City is not liable for discriminating against Mr. Valencia on the basis of a disability, or for failure to train, under Title II of the ADA and Section 504 of the Rehabilitation Act. See Gohier, 186 F.3d at 1222; see also Bates v. Chesterfield Cnty., Va., 216 F.3d 367, 373 (4th Cir. 2000) (affirming summary judgment for the defendant officers on the plaintiff's Fourth Amendment and ADA claims because the officers' conduct, including arresting the autistic plaintiff with force, was reasonable under the circumstances, and declining to "undertake an independent ADA inquiry in this case because our Fourth Amendment scrutiny has already accounted for all the situation's circumstances"); Est. of Holmes, 387 F. Supp. 3d at 1264 (same).

Therefore, Defendants' Motion for Summary Judgment as to Counts IV and V is **GRANTED**.

### b. Count VII (Deliberate indifference under Fourteenth Amendment)

The Deming Defendants argue that they are entitled to summary judgment as to Count VII of the Amended Complaint because (1) Mr. Valencia had no right to medical care prior to the use of force, ECF No. 97 at 8-9; (2) even if he had a right to medical care, reasonable force against an armed suspect is not deliberate indifference, id. at 9-10; and, in any event (3) "there is no clearly established obligation on officers to disregard a risk to their own lives to seek medical assistance for a dangerous suspect[,]" id. at 7 (citing Wilson v. Meeks, 52 F.3d 1547, 1556 (10th Cir. 1995)); see also id. at 11-13.

Plaintiffs argue that genuine issues of material fact exist as to whether the officers violated Mr. Valencia's Fourteenth Amendment rights "by failing to render immediate aid to Mr. Valencia, after he was shot once and clearly subdued."[10]  ECF No. 101 at 18.  In this regard, they rely on their argument that all shots the officers fired after the first shot were objectively unreasonable in violation of the Fourth Amendment's prohibition against the excessive use of force, see id. at 16-19—an argument the Court rejected, supra.  They also appear to argue that the Deming Defendants were deliberately indifferent by failing to render Mr. Valencia aid for his mental illness prior to shooting him.  See id. at 18.

In their Reply, Defendants maintain that they are entitled to summary judgment as to Count VII because (1) the Fourteenth Amendment does not require officers to render medical aid to a suspect who has not been apprehended and presents an active threat, and (2) Plaintiffs' claim that the officers provided inadequate medical care after Mr. Valencia was shot once is simply a reiteration of their excessive force claim.  ECF No. 102 at 9-11.

The Fourteenth Amendment's Due Process Clause requires government actors "to provide medical care to persons . . . who have been injured while being apprehended by the police." City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983).  "The Fourteenth Amendment 'entitles pretrial detainees to the same standard of medical care owed to convicted inmates under the Eighth Amendment.'" McCowan v. Morales, 945 F.3d 1276, 1290 (quoting Rife v. Okla. Dep't of Pub. Safety, 854 F.3d 637, 647 (10th Cir. 2017)).  To succeed under that standard a plaintiff must show "deliberate indifference to his serious medical needs." Id.

---

[10]     Plaintiffs do not argue that Defendants violated Mr. Valencia's Fourteenth Amendment rights by failing to call for medical aid after all shots had been fired; and they appear to concede that Defendants promptly called for medical care after all shots had been fired. See ECF No. 101 at 18 (arguing that "the Deming Defendants denied Mr. Valencia medical aid by shooting him multiple times before calling for medical aid").

The test for deliberate indifference has an objective and subjective component.  Id. at 1291.  "The objective component of deliberate indifference is met if the 'harm suffered rises to a level 'sufficiently serious' to be cognizable under the Cruel and Unusual Punishment Clause.'"  Burke v. Regalado, 935 F.3d 960, 992 (10th Cir. 2019) (quoting Mata v. Saiz, 427 F.3d 745, 753 (10th Cir. 2005) (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994))).  "To satisfy the subjective component, the plaintiff must show the official 'knows of and disregards an excessive risk to inmate health or safety.'"  Id. (quoting Farmer, 511 U.S. at 837).  "The official 'must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'"  Id. (quoting Self v. Crum, 439 F.3d 1227, 1231 (10th Cir. 2006)).

The Court finds that Defendants are entitled to qualified immunity as to Count VII because even assuming Defendants violated Mr. Valencia's right to medical care, Plaintiffs have failed to carry their burden of establishing that right was clearly established at the time of the incident.

First, Plaintiffs cite no authority holding that officers encountering a suspect they have probable cause to believe poses a threat of serious physical harm to themselves or to others are required to ignore the threat and provide medical or mental health care.[11]  See Wilson, 52 F.3d at 1556 ("[T]he first duty of a police officer is to ensure the safety of the officers and the public[.]"), abrogated on other grounds by Saucier v. Katz, 533 U.S. 194 (2001).

Second, Plaintiffs cite no authority holding that the Fourteenth Amendment establishes an affirmative duty on law enforcement officers to provide medical care to an individual after

---

[11]     In its prior Summary Judgment Order, the Court necessarily found that the Deming Defendants had probable cause to believe that there was a threat of serious physical harm to themselves or to others.  See ECF No. 92 at 12 (quoting Ceballos, 919 F.3d at 1213-14 ("[O]fficers are not justified in using deadly force unless objectively reasonable officers in the same position 'would have had probable cause to believe that there was a threat of serious physical harm to themselves or to others[.]'") (quoting Thomson v. Salt Lake Cnty., 584 F.3d 1304, 1313 (2009)).

shooting him.  Nor could they, as the Tenth Circuit has held that "whether officers have a duty to provide medical care in circumstances like those in the instant case remains an open question in this circuit post-[Wilson]."   Crittenden v. City of Tahlequah, 786 F. App'x 795, 804 (10th Cir. 2019).  In Crittenden, officers were involved in a standoff with a man ("Crittenden") they believed to be armed who was hiding in the attic of a house.  Id. at 798-99.  When Crittenden jumped from the attic's vent, an officer shot him multiple times, including once in the head.  Id. at 799.  After the shots were fired, one officer radioed for Emergency Medical Services ("EMS") while the other handcuffed Crittenden.  Id.  When one officer turned Crittenden over on his back he was gasping for air.  Id.  None of the officers on the scene provided Crittenden medical aid.  See id.  EMS arrived a few minutes later but were not permitted to approach until the officers were sure there were no other individuals in the attic.  Id.  About twelve minutes after they arrived on the scene, EMS was escorted to Crittenden, who was still breathing.  Id.  However, he ultimately died due to the gunshot wound to the head.  Id.

Crittenden's estate sued all of the officers on the scene under the Fourteenth Amendment for failing to provide medical care to Crittenden after the shooting.  Id. at 796.  The district court found that the officers had qualified immunity because they did not violate Crittenden's constitutional rights, and even if they did, the constitutional rights at issue were not clearly established.  Id.  The Tenth Circuit affirmed on the grounds that even assuming the officers violated Crittenden's constitutional rights, the right was not clearly established.  Id. at 797.  It held that "[t]here is no precedent supporting the notion that police officers have an affirmative duty to provide immediate medical care in situations such as the instant case."  Id. at 802 (citing Wilson, 52 F.3d at 1556).  It observed that the Tenth Circuit in Wilson "refused to hold that the Due Process Clause establishes an affirmative duty on police officers to provide medical care (even something

as basic as CPR), in any and all circumstances, or to render first aid." Id. (citing Wilson, 52 F.3d at 1556).  It further observed, though, that "Wilson did not foreclose the possibility that such a duty could exist in some other factual circumstance. Id. (citing Wilson, 52 F.3d at 1555-56).

While it is possible that the Due Process Clause establishes an affirmative duty on police officers to provide medical care in some circumstances, Plaintiffs have failed to carry their "heavy burden" of demonstrating that the law clearly establishes such a duty under the circumstances of this case.  Id. at 804.  Consequently, Defendants are entitled to qualified immunity as to Count VII, and Defendants' Motion for Summary Judgment as to Count VII is **GRANTED**.

    **c.  Count VIII: Municipal liability**

The City of Deming argues that it is entitled to summary judgment on the municipal liability claim asserted in Count VIII of the Amended Complaint because there is no underlying violation of Mr. Valencia's rights for which it can be liable.  ECF No. 97 at 14.

Plaintiffs argue that the City is not entitled to summary judgment on Count VIII because Defendants used excessive force against Mr. Valencia "by continuing to shoot him numerous times after he had already been subdued" in violation of his Fourth Amendment rights.  ECF No. 101 at 19, 21.

In their Reply, the City maintains that because there was no underlying violation by any of its officers for which it can be held liable, it is entitled to summary judgment on the municipal liability claim.  ECF No. 102 at 11 (citing Olsen v. Layton Hills Mall, 312 F.3d 1304, 1317-18 (10th Cir. 2002)).

"When an officer deprives a citizen of a constitutional right, . . . municipal governments may incur liability under § 1983 when 'the action that is alleged to be unconstitutional implements or executes a policy, statement, ordinance, regulation or decision officially adopted and

promulgated by that body's officers.'" <u>Olsen</u>, 312 F.3d at 1318 (quoting <u>Monell v. Dep't of Soc.</u> <u>Servs.</u>, 436 U.S. 658, 690 (1978)).   However, a municipality is not "liable [for constitutional violations] when there was no underlying constitutional violation by any of its officers."   <u>Id.</u> (quoting <u>Hinton v. City of Elwood</u>, 997 F.2d 774, 782 (10th Cir. 1993) (quotation marks omitted)).

Here, the Court has found that the individual Deming Defendants did not violate Mr. Valencia's Fourth Amendment right against the excessive use of force.  ECF No. 92 at 12, 20. Consequently, Defendants' Motion for Summary Judgment as to Count VIII is **GRANTED**.  <u>See</u> <u>Olsen</u>, 312 F.3d at 1318.

## V.   Conclusion

The foregoing resolves all remaining claims in this action.  <u>See</u> ECF No. 84 (resolving all claims against Defendant New Mexico Department of Public Safety); ECF No. 90 (dismissing all claims against John Does 1-9); ECF No. 92 (resolving all claims against Defendant Luna County,[12] Arturo Baez, David Acosta, and Lee Cook Jordan; and resolving Counts I, II, III, and VI against the Deming Defendants).

---

[12]       In its Order Granting the Deming Defendants' Motion for Summary Judgment on Counts I, II, III, and VI of Plaintiff's First Amended Complaint, the Court noted that its findings that (1) the OIC Officers did not use constitutionally excessive force to arrest Mr. Valencia under the Fourth Amendment, and (2) the OIC Officers did not commit an assault or battery of Mr. Valencia under New Mexico law, "are fully dispositive of the claims brought against Defendants Luna County and Arturo Baeza in Counts II, III, and VI . . . ." ECF No. 92 at 24.  Accordingly, it granted summary judgment in favor of Luna County and Arturo Baeza as to Counts II, III, and VI, and denied as moot Luna County and Arturo Baeza's separately-filed Motion for Summary Judgment and Qualified Immunity Against Counts II, III, and VI, ECF No. 25.  <u>See id.</u>

On April 26, 2024, Luna County filed a Motion to Dismiss Pursuant to the Court's prior Summary Judgment Order in which it had granted Luna County summary judgment.  ECF No. 104.  Plaintiffs filed a Response stating that they are "not technically opposed to the relief requesting that the counts disposed of in the Court's [prior Summary Judgment] Order be disposed in accordance with the Federal Rules of Civil Procedure[,]" ECF No. 105 at 2, but request that if the Court granted Luna County summary judgment in its prior Summary Judgment Order, the Court enter a separate judgment rather than a "dismissal[,]" <u>id.</u> (citing Fed. R. Civ. P. 58(a) & (d)).  Because the Court has already granted Luna County summary judgment as to all claims against it, <u>see id.</u>, the Motion to Dismiss is **DENIED AS MOOT**.  The Court will separately enter final judgment as to all claims.

Therefore, it is **HEREBY ORDERED** that:

1. The Deming Defendants' Motion for Summary Judgment on Counts IV, V, VII, and VIII of Plaintiffs' First Amended Complaint, ECF No. 97, is **GRANTED**;

2. The City of Deming is entitled to summary judgment on Counts IV, V and VIII;

3. Defendants Chavez, Quezada, Paz, Aragon, Sanchez, and Standridge are entitled to Summary Judgment as to Count VII;

4. Defendant Luna County's Motion to Dismiss Pursuant to the Court's Order Granting Defendants' Motion for Summary Judgment on Counts I, II, III, and IV of Plaintiff's First Amended Complaint; Denying as Moot Defendants Luna County and Arturo Baeza's Motion for Summary Judgment and Qualified Immunity Against Counts II, III, and VI, and Lifting Stay, ECF No. 104, is **DENIED AS MOOT**;

5. All other pending motions are **DENIED AS MOOT**;

6. This case is now **CLOSED**; and

7. The Court will separately issue **FINAL JUDGMENT**.

_____
**MARGARET STRICKLAND**
UNITED STATES DISTRICT JUDGE